## MICCA v. WISCONSIN NAT. LIFE INS. CO.
### No. 5368.

Circuit Court of Appeals, Seventh Circuit.
Feb. 27, 1935.

Arthur C. Fort, of Minonk, Ill., for appellant.

R. J. Kavanagh, of Peoria, Ill., for appellee.

Before EVANS and SPARKS, Circuit Judges, and BARNES, District Judge.

BARNES, District Judge.

This is an appeal by the plaintiff below, Peter Micca, Sr., the beneficiary named in an insurance policy issued by the defendant below, Wisconsin National Life Insurance Company, from a judgment rendered on a directed verdict for the defendant at the close of the plaintiff's case.

For an annual premium of $10, the insurance company insured Peter Micca, Jr., against the effects resulting from bodily injury sustained through external, violent, and accidental means while (among other things) driving in an automobile. The indemnity provided by the policy for the loss of life during the year beginning April 9, 1932, was $6,500. The policy contained the following provision: "This insurance does not cover 'such injury,' fatal or otherwise, sustained by the insured * * * (7) nor

any 'such injury' contributed to or caused by any mental or bodily infirmity or *exposure to unnecessary danger*." Peter Micca, Jr., died October 30, 1932, of bodily injuries sustained as a result of being struck on that day by a freight train of the Alton Railroad Company near the village of San Jose, Ill., while he was driving an automobile truck upon a public highway, which crosses the tracks of said railroad company near said village. The highway runs approximately due east and west between Logan and Tazewell counties, Ill. The railroad tracks, at the place of the accident, run from southwest to northeast and cross the highway at an angle of 52°54′. On the morning of the accident, the insured had come from a point east of the railroad tracks on the highway in question, had crossed said tracks on said highway, had continued on west, and had then turned south to the village of San Jose, where he had taken on a load of gravel. He then returned over the same route to the intersection of the east and west highway with the railroad tracks, where the accident took place.

The accident occurred on a Sunday morning, between 7 and 8 o'clock. It was a bright, clear, frosty morning. The insured was 24 years old, was quick mentally, had good sight and hearing, did not wear spectacles, did not use narcotics, was not a drinking man, and had not been drinking on the morning of the accident. He had been driving an automobile truck for 7 or 8 years prior to the accident as a regular occupation. At the time of the accident, he was driving a Diamond T 2½-ton truck. He was familiar with its operation. It was his favorite truck. The brakes were in good condition. Prior to the accident, the truck was going at the rate of about 25 miles per hour, there was no increase or decrease of its speed, and it did not slow down or stop.

There were windows on each side of the truck. The glass in the truck doors began about 18 or 20 inches from the floor board and extended upwards practically to the top of the cab, so that the driver in his regular position could see through the windows. The distance from the ground to the eyes of the insured while riding in the truck was 6 feet 5 inches.

There was nothing to obstruct the insured's view of the three warning signs located upon the highway upon which he was driving. One of these signs was approximately 400 feet west of the crossing. One was a stop sign near the crossing, which was visible for 200 feet, and the third was a large cross-arm sign just east of the crossing. The cross-arm sign was about 8 feet long and mounted on a post about 10 feet high.

There was nothing in the fields between the highway and the railroad right of way to obstruct the insured's view of the approaching train, from the engine of which smoke was rising, other than a knoll, which lay west of the railroad tracks. This knoll consisted of dirt thrown out in making a cut, and rose to a height, including a weed elevation of 3 feet, of 10.67 feet at its highest point. It was 200 or 300 feet long, and the elevation varied downward from the maximum elevation of 10.67 feet mentioned. The train was 1,485 feet long and the average height of the cars in the train was 13½ feet, while the height of the locomotive, smokestack, and cab was considerably more. The train was moving from southwest to northeast. It whistled four times when the engine was approximately 1,400 feet southwest of the crossing. Two of the blasts were long and two were short. The truck was then 500 feet west of the crossing. When the train and the truck were at these points, respectively, there was nothing in the fields between the highway and the railroad track to obstruct the view of any one looking from the highway. The view was perfectly clear. The train whistle was sounded again in a manner described as "continuous" for a few seconds prior to the collision. These blasts of the whistle were heard by people who were in a house, located 500 feet west of the crossing, the doors and windows of which were closed. They were also heard by another truck driver, who was 250 feet farther west from the railroad crossing than was the insured. Three witnesses testified that they heard no signal other than the whistle, but no witness testified that the bell did not ring.

At the time of the accident, there was in force in the state of Illinois a statute requiring any person controlling the movement of any self-propelled vehicle, upon approaching any railroad grade crossing, to reduce the speed of such vehicle to a rate not to exceed 10 miles per hour, and requiring such person, at all grade crossings at which "Stop" signs were placed, to bring such vehicle to a full stop at such "Stop" sign before proceeding over the railroad tracks. Smith-Hurd Rev. St. Ill. 1931, c. 121, § 161, Cahill's Ill. Rev. St. 1931, c. 121, par. 161.

The appellant contends that the provision above quoted of the insurance policy is contrary to public policy and void. He further contends that, even if said provision is valid, the question as to whether or not the death of the insured resulted from his "exposure to unnecessary danger" was for the jury.

Is the exception contrary to public policy and therefore void?

The words "exposure to unnecessary danger" and the words "unnecessary exposure to danger" have been held to mean practically the same thing (Sargent v. Cent. Accident Ins. Co., 112 Wis. 29, 87 N. W. 796, 88 Am. St. Rep. 946; Shevlin v. Am. Mutual Accident Ass'n, 94 Wis. 180, 68 N. W. 866, 36 L. R. A. 52; Pac. Mutual Life Ins. Co. v. Adams, 27 Okl. 496, 112 P. 1026, 1030), and have been held to include all cases of exposure to unnecessary danger where such exposure is attributable to negligence on the part of the insured. Helm v. Commercial Men's Ass'n, 279 Ill. 570, 117 N. E. 63; Sargent v. Cent. Accident Ins. Co., supra; Shevlin v. Am. Mutual Accident Ass'n, supra; Pac. Mutual Life Ins. Co. v. Adams, supra. See, also, Price v. Standard Life & Accident Ins. Co., 92 Minn. 238, 99 N. W. 887.

Aside from authority, it does not occur to one that there is anything inherently wrong in an insurer's exempting itself from liability for injury occurring in whole or in part through a failure of the insured to exercise ordinary care. A policy containing such a provision is, of course, less broad than it otherwise would be, but presumably the premium is less than it otherwise would be. Exceptions similar to that in the case at bar have been before various courts in a number of cases, and, so far as the reports reflect, the objection now made to the validity of the exception has never heretofore been raised. It has not heretofore occurred to parties litigant or to courts that there is anything contrary to public policy in such an exception. The Supreme Court of the United States has said, in Twin City Pipe Line Co. v. Harding Glass Co., 283 U. S. 353, 357, 51 S. Ct. 476, 478, 75 L. Ed. 1112, 83 A. L. R. 1168, that, in determining whether a contract contravenes the public policy of a state, "the Constitution, laws, and judicial decisions of that state, and as well the applicable principles of the common law, are to be considered." And in Baltimore & Ohio S. W. Ry. v. Voigt, 176 U. S. 498, 20 S. Ct. 385, 44 L. Ed. 560, and Steele v. Drummond, 275 U. S. 199, 205, 48 S. Ct. 53, 72 L. Ed. 238, the same court has indicated that a paramount principle of public policy is this, that courts are not lightly to interfere with freedom of contract. Our attention has been called to no provision of the Constitution or laws of the state of Illinois or to any judicial decisions of that state or to any principles of the common law which prohibit contracting for the exemption found in the policy at bar, and, accordingly, we conclude that such exemption is not contrary to the public policy of Illinois.

We come now to the question as to whether the District Court should have submitted the case to the jury. While the burden of proof on the proposition that the insured was not in the exercise of ordinary care for his own safety at and before the time of the accident in question was on the defendant (Fidelity & Casualty Co. v. Sittig, 181 Ill. 111, 113, 54 N. E. 903, 48 L. R. A. 359; Correll v. Nat. Accident Society, 139 Iowa, 36, 116 N. W. 1046, 130 Am. St. Rep. 294; see, also, 8 Couch's Cyc. of Ins. Law, p. 7174), yet if there was in the record substantial evidence of the failure of the insured to exercise ordinary care for his safety, and no substantial contradictory evidence, then it was the duty of the trial court to direct a verdict for the defendant. Substantially all of the evidence is set forth in the foregoing statement of facts. On those facts, and under the rules laid down in Miller v. Union Pac. R. Co., 290 U. S. 227, 54 S. Ct. 172, 78 L. Ed. 285, and in Baltimore & Ohio R. R. Co. v. Goodman, 275 U. S. 66, 48 S. Ct. 24, 72 L. Ed. 167, 56 A. L. R. 645, as interpreted by Pokora v. Wabash Ry. Co., 292 U. S. 98, 54 S. Ct. 580, 78 L. Ed. 1149, 91 A. L. R. 1049, can it be said that the evidence is of such conclusive character that if a verdict were returned for the plaintiff it would have to be set aside in the exercise of a sound judicial discretion, and that, accordingly, the verdict was properly directed for the defendant? All of the facts bearing on the question of the exercise of care by the insured, other than the fact of the existence of the knoll, above referred to, indicate that the insured was not in the exercise of ordinary care for his own safety. The knoll, including the weeds thereon, was, at its highest point, 10.67 feet high. The average height of the cars in the train was 13½ feet. The height of the locomotive, smokestack, and cab was considerably more, and smoke was coming from the smokestack. The knoll was from 200 to

300 feet long, while the train was 1,485 feet long, so that large portions of the train were at all times visible above and at the end or ends of the knoll. The insured had been over the railroad crossing in question once before and that time within a half hour of the accident. There were three warning signs in plain view of the insured on the highway. The locomotive whistle sounded repeatedly at a point 1,400 feet from the crossing at a time when the insured was 500 feet from the crossing. These blasts were heard by people inside a house with doors and windows closed, which house was farther away from the locomotive than was the insured. The conclusion is irresistible that "he did not look; or, if he looked, he did not heed the warning, and took the chance of crossing the track before the train could reach him. In either case he was clearly guilty of contributory negligence" (Miller v. Union Pac. Ry. Co., 290 U. S. 227, 54 S. Ct. 172, 173, 78 L. Ed. 285), and must be held to have exposed himself to unnecessary danger.

We are of the opinion that the District Court properly directed a verdict for the defendant, and its judgment is affirmed.