## POKORA *v.* WABASH RAILWAY CO.

No. 585.   Argued March 8, 9, 1934.—Decided April 2, 1934.

*Mr. W. St. John Wines* for petitioner.

*Mr. Homer Hall,* with whom *Mr. Walter M. Allen* was on the brief, for respondent.

MR. JUSTICE CARDOZO delivered the opinion of the Court.

John Pokora, driving his truck across a railway grade crossing in the city of Springfield, Illinois, was struck by a train and injured. Upon the trial of his suit for damages, the District Court held that he had been guilty of contributory negligence, and directed a verdict for the defendant. The Circuit Court of Appeals (one judge dissenting) affirmed, 66 F. (2d) 166, resting its judgment on the opinion of this court in *B. & O. R. Co.* v. *Goodman,* 275 U.S. 66. A writ of certiorari brings the case here.

Pokora was an ice dealer, and had come to the crossing to load his truck with ice. The tracks of the Wabash Railway are laid along Tenth Street, which runs north and south. There is a crossing at Edwards Street running east and west. Two ice depots are on opposite corners of Tenth and Edward Streets, one at the northeast corner, the other at the southwest. Pokora, driving west along Edwards Street, stopped at the first of these corners to get his load of ice, but found so many trucks ahead of him that he decided to try the depot on the other side of the way. In this crossing of the railway, the accident occurred.

The defendant has four tracks on Tenth Street, a switch track on the east, then the main track, and then two switches. Pokora, as he left the northeast corner where his truck had been stopped, looked to the north for approaching trains. He did this at a point about ten or fifteen feet east of the switch ahead of him. A string of box cars standing on the switch, about five to ten feet from the north line of Edwards Street, cut off his view of the tracks beyond him to the north. At the same time he listened. There was neither bell nor whistle. Still listening, he crossed the switch, and reaching the main track was struck by a passenger train coming from the north at a speed of twenty-five to thirty miles an hour.

The burden of proof was on the defendant to make out the defense of contributory negligence. *Miller* v. *Union Pacific R. Co.*, 290 U.S. 227, 232. The record does not show in any conclusive way that the train was visible to Pokora while there was still time to stop. A space of eight feet lay between the west rail of the switch and the east rail of the main track, but there was an overhang of the locomotive (perhaps two and a half or three feet), as well as an overhang of the box cars, which brought the zone of danger even nearer. When the front of the truck had come within this zone, Pokora was on his seat, and so was farther back (perhaps five feet or even more), just how far we do not know, for the defendant has omitted to make proof of the dimensions. Nice calculations are submitted in an effort to make out that there was a glimpse of the main track before the switch was fully cleared. Two feet farther back the track was visible, it is said, for about 130 or 140 feet. But the view from that position does not tell us anything of significance unless we know also the position of the train. Pokora was not protected by his glimpse of 130 feet if the train at the same moment was 150 feet away or farther. For all that appears he had no view of the main track northward, or none for

a substantial distance, till the train was so near that escape had been cut off. Cf. *Dobson* v. *St. Louis S. F. Ry. Co.*, 223 Mo. App. 812, 822; 10 S.W. (2d) 528; *Turner* v. *Minneapolis, St. P. & S. S. M. R. Co.*, 164 Minn. 335, 341; 205 N.W. 213.

In such circumstances the question, we think, was for the jury whether reasonable caution forbade his going forward in reliance on the sense of hearing, unaided by that of sight. No doubt it was his duty to look along the track from his seat, if looking would avail to warn him of the danger. This does not mean, however, that if vision was cut off by obstacles, there was negligence in going on, any more than there would have been in trusting to his ears if vision had been cut off by the darkness of the night. Cf. *Norfolk & W. Ry.* v. *Holbrook*, 27 F. (2d) 326. Pokora made his crossing in the day time, but like the traveler by night he used the faculties available to one in his position. *Johnson* v. *Seaboard Air Line R. Co.*, 163 N.C. 431; 79 S.E. 690; *Parsons* v. *Syracuse, B. & N. Y. R. Co.*, 205 N.Y. 226, 228; 98 N.E. 331. A jury, but not the court, might say that with faculties thus limited, he should have found some other means of assuring himself of safety before venturing to cross The crossing was a frequented highway in a populous city. Behind him was a line of other cars, making ready to follow him. To some extent, at least, there was assurance in the thought that the defendant would not run its train at such a time and place without sounding bell or whistle. *L. & N. R. Co.* v. *Summers*, 125 Fed. 719, 721; Illinois Revised Statutes, (1933 ed.), c. 114, ¶ 84.[1] Indeed, the

---

[1] The Illinois Act provides: "Every railroad corporation shall cause a bell of at least thirty pounds weight, and a steam whistle placed and kept on each locomotive engine, and shall cause the same to be rung or whistled by the engineer or fireman, at the distance of at least eighty rods from the place where the railroad crosses or intersects any public highway, and shall be kept ringing or whistling until such highway is reached."

statutory signals did not exhaust the defendant's duty when to its knowledge there was special danger to the traveler through obstructions on the roadbed narrowing the field of vision. *Wright* v. *St. Louis S. F. Ry. Co.,* 327 Mo. 557, 566; 37 S.W. (2d) 591; *Hires* v. *Atlantic City R. Co.,* 66 N.J.L. 30; 48 Atl. 1002; *Cordell* v. *N. Y. C. & H. R. R. Co.,* 70 N.Y. 119. All this the plaintiff, like any other reasonable traveler, might fairly take into account. All this must be taken into account by us in comparing what he did with the conduct reasonably to be expected of reasonable men. *Grand Trunk R. Co.* v. *Ives,* 144 U.S. 408, 417; *Flannelly* v. *Delaware & Hudson Co.,* 225 U.S. 597.

The argument is made, however, that our decision in *B. & O. R. Co.* v. *Goodman, supra,* is a barrier in the plaintiff's path, irrespective of the conclusion that might commend itself if the question were at large. There is no doubt that the opinion in that case is correct in its result. Goodman, the driver, traveling only five or six miles an hour, had, before reaching the track, a clear space of eighteen feet within which the train was plainly visible.[2] With that opportunity, he fell short of the legal standard of duty established for a traveler when he failed to look and see. This was decisive of the case. But the court did not stop there. It added a remark, unnecessary upon the facts before it, which has been a fertile source of controversy. " In such circumstances it seems to us that if a driver cannot be sure otherwise whether a train is dangerously near he must stop and get out of his vehicle, although obviously he will not often be required to do more than to stop and look."

There is need at this stage to clear the ground of brushwood that may obscure the point at issue. We do

---

[2] For a full statement of the facts, see the opinion of the Circuit Court of Appeals, 10 F. (2d) 58, 59.

not now inquire into the existence of a duty to stop, disconnected from a duty to get out and reconnoitre. The inquiry, if pursued, would lead us into the thickets of conflicting judgments.[3] Some courts apply what is often spoken of as the Pennsylvania rule, and impose an unyielding duty to stop, as well as to look and listen, no matter how clear the crossing or the tracks on either side. See, e.g., *Benner* v. *Philadelphia & Reading R. Co.*, 262 Pa. 307; 105 Atl. 283; *Thompson* v. *Pennsylvania R. Co.*, 215 Pa. 113; 64 Atl. 323; *Hines* v. *Cooper*, 205 Ala. 70; 88 So. 133; cf. *Pennsylvania R. Co.* v. *Yingling*, 148 Md. 169; 129 Atl. 36. Other courts, the majority, adopt the rule that the traveler must look and listen, but that the existence of a duty to stop depends upon the circumstances, and hence generally, even if not invariably, upon the judgment of the jury. See, e.g., *Judson* v. *Central Vermont R. Co.*, 158 N.Y. 597, 605, 606; 53 N.E. 514, and cases cited; *Love* v. *Fort Dodge R. Co.*, 207 Iowa 1278, 1286; 224 N.W. 815; *Turner* v. *Minneapolis R. Co.*, *supra; Wisconsin & Arkansas Lumber Co.* v. *Brady*, 157 Ark. 449, 454; 248 S.W. 278; cf. *Metcalf* v. *Central Vermont R. Co.*, 78 Conn. 614; 63 Atl. 633; *Gills* v. *N. Y. C. & St. L. R. Co.*, 342 Ill. 455; 174 N.E. 523. The subject has been less considered in this court, but in none of its opinions is there a suggestion that at any and every crossing the duty to stop is absolute, irrespective of the danger. Not even in *B. & O. R. Co.* v. *Goodman, supra*, which goes farther than the earlier cases, is there support for such a rule. To the contrary, the opinion makes it clear that the duty is conditioned upon the presence of impediments whereby sight and hearing become inadequate for the traveler's protection. Cf. *Murray* v. *So. Pacific Co.*, 177 Cal. 1, 10; 169 Pac. 675 *Williams* v. *Iola Electric R. Co.*, 102 Kan. 268, 271; 170 Pac. 397.

---

[3] The cases are collected in 1 A.L.R. 203 and 41 A.L.R. 405.

Choice between these diversities of doctrine is unnecessary for the decision of the case at hand. Here the fact is not disputed that the plaintiff did stop before he started to cross the tracks. If we assume that by reason of the box cars, there was a duty to stop again when the obstructions had been cleared, that duty did not arise unless a stop could be made safely after the point of clearance had been reached. See, e.g., *Dobson* v. *St. Louis S. F. Ry. Co., supra.* For reasons already stated, the testimony permits the inference that the truck was in the zone of danger by the time the field of vision was enlarged. No stop would then have helped the plaintiff if he remained seated on his truck, or so the triers of the facts might find. His case was for the jury unless as a matter of law he was subject to a duty to get out of the vehicle before it crossed the switch, walk forward to the front, and then, afoot, survey the scene. We must say whether his failure to do this was negligence so obvious and certain that one conclusion and one only is permissible for rational and candid minds. *Grand Trunk Ry. Co.* v. *Ives, supra.*

Standards of prudent conduct are declared at times by courts, but they are taken over from the facts of life. To get out of a vehicle and reconnoitre is an uncommon precaution, as everyday experience informs us. Besides being uncommon, it is very likely to be futile, and sometimes even dangerous. If the driver leaves his vehicle when he nears a cut or curve, he will learn nothing by getting out about the perils that lurk beyond. By the time he regains his seat and sets his car in motion, the hidden train may be upon him. See, e.g., *Torgeson* v. *Missouri-K.-T. R. Co.,* 124 Kan. 798, 800, 801; 262 Pac. 564; *Dobson* v. *St. Louis S. F. R. Co., supra; Key* v. *Carolina & N. W. R. Co.,* 150 S.C. 29, 35; 147 S.E. 625; *Georgia Railroad & Banking Co.* v. *Stanley,* 38 Ga. App. 773, 778; 145 S.E. 530. Often the added safeguard will be dubious though the track happens to be straight, as

it seems that this one was, at all events as far as the station, about five blocks to the north. A train traveling at a speed of thirty miles an hour will cover a quarter of a mile in the space of thirty seconds. It may thus emerge out of obscurity as the driver turns his back to regain the waiting car, and may then descend upon him suddenly when his car is on the track. Instead of helping himself by getting out, he might do better to press forward with all his faculties alert. So a train at a neighboring station, apparently at rest and harmless, may be transformed in a few seconds into an instrument of destruction. At times the course of safety may be different. One can figure to oneself a roadbed so level and unbroken that getting out will be a gain. Even then the balance of advantage depends on many circumstances and can be easily disturbed. Where was Pokora to leave his truck after getting out to reconnoitre? If he was to leave it on the switch, there was the possibility that the box cars would be shunted down upon him before he could regain his seat. The defendant did not show whether there was a locomotive at the forward end, or whether the cars were so few that a locomotive could be seen. If he was to leave his vehicle near the curb, there was even stronger reason to believe that the space to be covered in going back and forth would make his observations worthless. One must remember that while the traveler turns his eyes in one direction, a train or a loose engine may be approaching from the other.

Illustrations such as these bear witness to the need for caution in framing standards of behavior that amount to rules of law. The need is the more urgent when there is no background of experience out of which the standards have emerged. They are then, not the natural flowerings of behavior in its customary forms, but rules artificially developed, and imposed from without. Extraordinary situations may not wisely or fairly be subjected to

tests or regulations that are fitting for the common-place or normal. In default of the guide of customary conduct, what is suitable for the traveler caught in a mesh where the ordinary safeguards fail him is for the judgment of a jury. *Dolan* v. *D. & H. C. Co.,* 71 N.Y. 285, 288, 289; *Davis* v. *N. Y. C. & H. R. R. Co.,* 47 N.Y. 400, 402. The opinion in *Goodman's* case has been a source of confusion in the federal courts to the extent that it imposes a standard for application by the judge, and has had only wavering support in the courts of the states.[4] We limit it accordingly.

The judgment should be reversed and the cause remanded for further proceedings in accordance with this opinion.

*Reversed.*

---

[4] Many cases are collected in 43 Harvard Law Review 926, 929, 930, and in 56 A.L.R. 647.

See also: *Dobson* v. *St. Louis S. F. R. Co., supra; Key* v. *Carolina & N. W. R. Co., supra; Gills* v. *N. Y. C. & St. L. R. Co., supra; Georgia Railroad & Banking Co.* v. *Stanley, supra; Miller* v. *N. Y. C. R. Co.,* 226 App. Div. 205, 208, 234 N.Y.S. 560; 252 N.Y. 546, 170 N.E. 137; *Schrader* v. *N. Y. C. & St. L. R. Co.,* 254 N.Y. 148, 151; 172 N.E. 272; *Dolan* v. *D. & H. C. Co., supra; Huckshold* v. *St. L., I. M. & S. R. Co.,* 90 Mo. 548; 2 S.W. 794. Contra: *Koster* v. *Southern Pacific Co.,* 207 Cal. 753, 762; 279 Pac. 788; *Vaca* v. *Southern Pacific Co.,* 91 Cal. App. 470, 475; 267 Pac. 346; *Davis* v. *Pere Marquette R. Co.,* 241 Mich. 166, 169; 216 N.W. 424; cf. *Torgeson* v. *Missouri-K.-T. R. Co., supra.*