[S. F. No. 16978. In Bank. June 12, 1944.]

MARIO TOSCHI, Appellant, v. L. L. CHRISTIAN et al., Respondents.

William E. Ferriter and James C. Purcell for Appellant.

Dunne & Dunne and Arthur B. Dunne for Respondents.

SCHAUER, J.—This is an action to recover damages for personal injuries sustained by the plaintiff in a crossing collision between a truck driven by him and a locomotive of the defendant railroad company. Named as defendants are the Southern Pacific Company (hereinafter sometimes referred to as the railroad), the fireman and the engineer who operated the locomotive, and two flagmen who were stationed at the crossing, the latter four being employees of the railroad. The plaintiff appeals from a judgment of nonsuit. So far as concerns disposition of this appeal the negligence of the defendants is conceded and the sole question is whether the trial court was correct in its determination that plaintiff was guilty of contributory negligence as a matter of law. We have concluded that in the state of the record the question of contributory negligence was one of fact.

There are substantial conflicts in the evidence as disclosed by the transcript and, as is not unusual in the enthusiasm of advocacy, still more in the contentions of counsel. █ It is elementary, however, that on appeal from a judgment of nonsuit the evidence shall be viewed in the light most favorable to plaintiff. (*Gregg* v. *Western Pac. R. R. Co.* (1924), 193 Cal. 212, 216 [223 P. 553].) Application of this rule strikes down at once, and without necessity for further comment thereon, all those portions of defendants' argument which depend on the resolution of conflicting inferences favorable to defendants. Viewing the record obediently to the designated rule this opinion must predicate the following facts:

This is not a rural crossing case. The locale of the accident is a congested mercantile and industrial district in the city of San Francisco in the area of a passenger and freight terminal where six substantially parallel tracks of defendant company cross Berry Street and where switching operations are almost constantly in progress. Berry Street runs generally east and west, and is intersected by Seventh Street running generally north and south. The most westerly of the six tracks curves from the northeast into Seventh Street and reaches the approximate center of that street (down which it then runs) at the intersection of Berry and Seventh. Immediately east of Seventh Street are the other five tracks crossing Berry. The most westerly track (in the center of Seventh Street) figures little in the controversy. The next two tracks are main line tracks and the remaining three (branching into a fourth just north of Berry Street) are yard

tracks. There was a flagman's shelter at the northeast corner of the intersecting streets and another flagman's shelter on the south side of Berry Street just east of the sixth track. The collision occurred on the first (westerly) main line track; i. e., the first track east of the most westerly of the six tracks. The five tracks crossing Berry Street east of Seventh are closely spaced and may be spoken of as a group. Two flagmen were normally present in this area, one on either side of this group of five tracks, and both were on duty on the day of the accident. All the tracks approach Berry Street (and Seventh) on an easy curve from the northeast and cross Berry at approximately right angles. Except for the flagman's shelter at the northeast corner of the two streets, there were no fixed obstructions to a view of the tracks by a person traveling south on Seventh Street (as was plaintiff here) in the block just north of the intersection. However, at the time of the accident several automobiles were parked along Seventh Street, between plaintiff's route (while he was on Seventh Street) and the tracks. A driver on Berry Street or one attempting to turn onto Berry Street from Seventh Street cannot ordinarily know whether any locomotives which may be moving in the yards in the course of switching operations will cross Berry Street or stop short of it. Recognizing this fact and in an effort to expedite traffic and secure safety, the railroad regularly stationed a flagman on each side of the group of five tracks, as previously mentioned, with the duty of going out into Berry and raising a stop sign as a warning for highway vehicles when railroad traffic was to cross, and of flagging down railroad engines when necessary to permit highway traffic to be cleared from the tracks. Plaintiff was familiar with the crossing; in his work as a truck driver he had driven over it at least twice and sometimes twenty times every working day for ten years. During all this time flagmen were stationed at the crossing and plaintiff was accustomed to rely upon their signals. In reliance upon them and pursuant to the long-established practice, when a flagman held up a stop sign plaintiff stopped; when a stop sign was not displayed or a flagman not in view plaintiff, apparently, had always previously found the crossing safe.

On the morning of April 12, 1938, plaintiff approached the crossing driving south on Seventh Street and intending to turn left onto Berry Street. This was to have been his

fifth traverse of the crossing that morning. The day was clear. About 50 feet before he came to the intersection he looked to his left "On the tracks . . . straight ahead and all around," and saw no railroad traffic; at about the same time he decreased his speed from approximately 25 miles an hour to 10 miles an hour and shifted into a lower gear. He saw two automobiles approaching, one on Seventh Street from the south and one on Berry Street from the west; both cars stopped to let plaintiff make the left-hand turn onto and across the railroad tracks. He also looked for a flagman but there was none visible on the Seventh Street side of the tracks. (This flagman was not seen at all on this occasion by plaintiff but other witnesses establish that he emerged from his shelter after the accident.) Plaintiff turned onto Berry Street and drove safely across the first or single track (which extends into and along the center of Seventh Street) and then saw one flagman (Darrough) on the far side of the group of five tracks which he was approaching. Plaintiff observed that such flagman was not standing in the middle of Berry Street, the usual position of the flagman when a locomotive was approaching, but was close to the north boundary line of the street; that he was not signaling traffic with either the stop sign, which was regularly used to signal highway vehicles, or the red flag, which was provided for signaling to railroad traffic, but was instead holding the sign and the flag under his arm; and that in his hands he held a mirror with which he was playing by flashing sunlight in it. After plaintiff turned, he did not look to the left along the tracks. As he drove onto the first track (referred to as the "Southbound Main Line") of the group of five tracks light from the mirror, with which the flagman was still playing, was flashed in his eyes, blinding him. He stopped and immediately his truck was struck by an engine which was backing in a southwesterly direction on the curved track and which had been approaching at an angle from behind him and to his left as he drove south down Seventh Street. At no time had plaintiff seen the engine before it hit his truck and there is testimony from which it may be inferred that he could not have heard it: the neighborhood was noisy, the street was rough, and on the truck driven by plaintiff was a concrete mixer with drums which constantly revolved. For the purpose of this appeal we must take as true testimony that neither a whistle nor a bell on the engine sounded a warning.

Defendants contend that from these facts it is evident that plaintiff did not exercise the slightest care for his own safety; that had he exercised any care the accident would not have happened. Plaintiff argues that the fact that he could have seen the engine had he looked with greater care "is a wholly false quantity in the case," that he was not only entitled but required, whether or not he saw a train approaching, to rely upon the long-established custom that the absence of a flagman was an assurance of safety since, so he asserts, a traveler who would wait at this crossing until no engine was within sight or hearing could never cross. We are of the opinion that the correct view of the case lies between these two extremes.

Counsel for defendants assiduously argue the fact as to whether plaintiff's view of the tracks and of the approaching engine was open or impeded, and contend that if it was open plaintiff's failure to look and see and stop in safety inexorably convicts him of contributory negligence. They rely upon *Koch* v. *Southern Cal. R. Co.* (1906), 148 Cal. 677 [84 P. 176, 113 Am.St.Rep. 332, 7 Ann.Cas. 795, 4 L.R.A.N.S. 521], and cases which have followed that decision. We think that in this argument counsel are viewing the evidence and selecting conflicting inferences favorable to their clients rather than to the plaintiff, but even if we assume their factual theory, as far as it goes, we find their proposition of law untenable. The "stop, look and listen" rule, urged by defendants, will not be applied to factual bases where its application would be unreasonable. In the circumstances of this case, which comprise a six-track railroad yard crossing, switching operations progressing almost constantly, the employment of two flagmen by the railroad, whose duties involve traffic control on the highway and to some extent on the railroad, and a practical necessity for travelers on the highway to rely on the flagmen's signals because ordinarily it would be impossible for such travelers after they had observed railroad traffic approaching to know whether it would cross or stop short of the highway, the "stop, look and listen" rule is not wholly appropriate and cannot operate to establish contributory negligence as a matter of law. Merely adding the further circumstance that a traveler knew that two of the six tracks were main line tracks and that ordinarily trains on those tracks would constitute through traffic would not alter the legal proposition above stated.

The extent to which a traveler may rely upon the failure of a mechanical device to operate, or upon the absence of a customary flagman, cannot be precisely defined as a pure proposition of law applicable to all the circumstances which usually complement such occurrences. ■ Standards of care are typically relative; rules of law are basically absolute. Hence, in regard to negligence, any attempt to screen factual conduct into legal classifications through a sieve of absolute law will be impracticable whenever the related circumstances admit of materially conflicting inferences. In other words, the actor's conduct must always be gauged in relation to all the other material circumstances surrounding it and if such other circumstances admit of a reasonable doubt as to whether such questioned conduct falls within or without the bounds of ordinary care then such doubt must be resolved as a matter of fact rather than of law. (*Cf. Peri* v. *Los Angeles Junction Ry.* (1943), 22 Cal.2d 111, 120 [137 P.2d 441]; *Pokora* v. *Wabash R. Co.* (1934), 292 U.S. 98, 105 [54 S.Ct. 580, 583, 78 L.Ed. 1149, 1155, 91 A.L.R. 1049, 1054]; *Gregg* v. *Western Pac. R. R. Co.* (1924), *supra*, 193 Cal. 212, 224 [223 P. 553]; *Zibbell* v. *Southern Pacific Co.* (1911), 160 Cal. 237, 240 [116 P. 513]; *Wessling* v. *Southern Pac. Co.* (1931), 116 Cal.App. 447, 450-451 [3 P.2d 22]; *Ogburn* v. *Atchison etc. Ry. Co.* (1930), 110 Cal.App. 587, 594 [294 P. 491].)

■ It is settled in this state that "A railroad company will not be permitted to encourage persons to relax their vigil concerning the dangers that lurk in railroad crossings by assuring them, through the erection of safety devices, that the danger has been removed or minimized, and, at the same time, to hold them to the same degree of care as would be required if those devices had not been provided. [Citations.] This does not mean that a person approaching a guarded crossing may blindly rely upon the absence of warning by a watchman, or the silence of an automatic signal, and proceed without further regard for his own safety." (*Will* v. *Southern Pacific Co.* (1941), 18 Cal.2d 468, 474 [116 P.2d 44].)

■ Here it does not appear that plaintiff exercised no care whatsoever; i. e., that he drove blindly ahead, heedless of his own safety. He testified that he looked at the tracks before he turned. He slowed the speed of his truck and shifted to a lower gear. His other testimony indicates that he was not oblivious of his surroundings and that he had in mind the relationship of Berry Street and the traffic thereon

to the railroad tracks and the traffic over them. While he was on Seventh Street, he could not have seen the engine merely by looking to his left because it was behind him. Whether he could have seen it even by looking backward over his shoulder is not clear. Behind the rear window of the cab of his truck was mounted a concrete mixer about 10 feet high, that is, higher than the cab itself. The near edge of the window in the left door of the cab was about 4 inches in front of plaintiff. Thus it may be that before he turned plaintiff could have seen the engine only by leaning forward, putting his head out the side window, and looking back. Whether no reasonable man exercising ordinary care, about to traverse a busy metropolitan crossing customarily guarded by two flagmen, having the knowledge of the locality which plaintiff possessed, driving the truck which plaintiff was operating, and under the other circumstances shown here, would fail to adopt such mode of observation is a question of fact for a jury, not one of law for a court. In the Koch case (*supra*, 148 Cal. 677) the court declared (p. 680): "Of course, in any case such as this, where it is shown that a plaintiff has exercised some care, the question whether or not the care actually exercised was due and sufficient will always be a matter for determination by the jury." The majority of the court held that upon the facts in that case the plaintiff had failed to exercise any care whatsoever. Chief Justice Beatty, dissenting, differed from his associates, not fundamentally in the law but rather in his view and interpretation of the evidence. The rule which we follow in our view of the evidence has already been stated. We entertain no doubt that the record before us, insofar as the doctrine of the Koch case is concerned, presents a factual question requiring submission to the jury.

Pertinent in the surrounding circumstances of the instant case, it is to be noted that only after plaintiff turned, passing the momentary obstruction of the small flagman's shelter, did he have available a direct view of the tracks to his left. (Plaintiff completed his turn between 10 and 30 feet from the first main line track, depending upon whether he "cut the corner," as discussed *infra*.) His prior observation had disclosed no train or engine; his present observation disclosed nothing which he interpreted as a warning. He may well have regarded the presence of a flagman at the side of the street with his stop sign under his arm as a greater indication

of safety than the absence of a flagman. In his belief that one flagman would not be absent from sight and the other engaged in childish play if danger was imminent, plaintiff may have been "deceived by appearances calculated to deceive an ordinarily prudent man." (*Sheets* v. *Southern Pacific Co.* (1931), 212 Cal. 509, 514 [299 P. 71].) We do not say that plaintiff's failure to look to his left as he turned onto the tracks and before he was blinded by the mirror flash is or is not excused; that is a question of fact. In the circumstances there appears no "standard of conduct . . . so obvious as to be applicable to all persons." (*Chrissinger* v. *Southern Pacific Co.* (1915), 169 Cal. 619, 624 [149 P. 175]; see, also, *Fernandes* v. *Sacramento City Railway Co.* (1877), 52 Cal. 45, 50.)

Defendants argue that plaintiff's own testimony shows he "cut the corner" in violation of section 540(b) of the Vehicle Code, which conduct was negligent *per se;* that had he turned properly he would have had a direct view of the tracks for several more feet before he came upon them. Although plaintiff did testify that he "cut the corner" and although he so indicated his course on a diagram of the intersection, he also testified that he was "coming right in the center, right over the manhole"; "I was coming right near to the manhole; I was going right over that." It appears from defendants' Exhibit 5 that the manhole was in the center of the intersection. This conflict in the testimony of plaintiff, like any other conflict in the evidence, in conformity with the above mentioned rule governing appeals from judgments of nonsuit, must be resolved in favor of plaintiff's case. But assuming that plaintiff did "cut the corner," whether his violation of the Vehicle Code section was a proximately contributing cause of the collision is, under the circumstances depicted, a question of fact. (See *Sheets* v. *Southern Pac. Co.* (1934), 1 Cal.2d 408, 412-413 [35 P.2d 121]; *Crawford* v. *Southern Pacific Co.* (1935), 3 Cal.2d 427, 433 [45 P.2d 183].)

Defendants point out that although there is general testimony that the neighborhood was noisy, there is no evidence that any locomotive except the one which struck plaintiff was moving in the yards at the time of the collision or that there was any other noise which would have prevented plaintiff's hearing the sound of the locomotive's operation except that made by his own truck, which was within his control.

To silence the sound of the truck, however, it would have been necessary, not only that plaintiff stop to avoid the noise of travel over the rough cobblestone street, and turn off the truck motor, but also that he turn off the engine which kept the drums of the concrete mixer constantly revolving. If the drums of the mixer were not kept revolving the concrete would tend to dry and set and freeze the drums so that they could not be operated. It may be doubted whether these suggested precautions would be taken by the ordinarily careful driver in the circumstances.

 Plaintiff argues that the flashing of the mirror into his eyes caused him to bring his vehicle to a stop upon the track, which he might otherwise have cleared in safety. Defendants urge that the incident of the mirror could have had no causal connection with the accident since from plaintiff's own testimony it appears that the light shone only at the very instant of collision, after he had negligently driven onto the track. Plaintiff testified, "As I stopped, that second I was hit by a train. . . ." We are not satisfied that his testimony of immediacy of the collision *after stopping* of the truck completely precludes the possibility that the mirror flash which *blinded him and caused him to stop* on the track may have caused him to stop just in time to be struck by the engine. There would necessarily be some appreciable interval of time between the flashing of the mirror and the translation of such stimulus into stoppage of the truck. That defendants' interpretation of the incident may appear more probable than plaintiff's is a consideration not within the province of a reviewing court. Certainly the incident is not one so within the range of common experience that its solution is obvious.

Defendants further contend that there is no evidence identifying the man supposed to have flashed the mirror as the flagman Darrough. Plaintiff testified, "I saw this fellow over here (indicating), with that signal under his arm, playing with a mirror, and it shone right in my eyes, and I stopped"; also, "I . . . saw this other flagman on the other side that was playing with the mirror. He had his stop sign under his arm, with his little flag . . ." Furthermore Darrough was in court and apparently was the person indicated by plaintiff. Darrough himself testified that he was the flagman on the far side of the tracks at the time of the accident. While he de-

nied that he was playing with a mirror it is obvious that the evidence amply supports a contrary conclusion.

As stated above, plaintiff contends that, even had he seen the approaching engine, he could have assumed, in the absence of a signal and in the light of the other circumstances shown, that it was safe to cross. Defendants call attention to plaintiff's testimony that he knew the first two tracks (of the group of five) were main line tracks, and argue that he must have known that no switching operations take place on the main line tracks, that had he seen the engine he would have known from the fact that it was proceeding on a main line track that it was not a switch engine but a road engine on its way to the roundhouse south of Berry Street and hence would not stop short of the crossing. Since plaintiff admittedly did not see the engine, it is not necessary to discuss these conflicting contentions as to what would have been reasonable conduct on plaintiff's part had he seen it, identified the track it was on, and drawn the deductions suggested. Inasmuch as it is a question of fact as to whether plaintiff was contributively negligent in failing to see or hear the engine at all, the case must go to the jury on that theory and for determination of that fact.

The judgment of nonsuit is reversed.

Gibson, C. J., Shenk, J., Curtis, J., Edmonds, J., and Carter, J., concurred.

TRAYNOR, J.—I concur in the judgment. I cannot subscribe, however, to the view that when a jury determines standards of care in negligence cases it is simply finding facts. It is a question of law what the rule or standard of conduct should be for adjudging the actions of men as lawful or unlawful and for determining the consequences of those actions. A question of fact relates to what acts or events have occurred or what conditions exist or have existed. (See Thayer, Preliminary Treatise on Evidence at The Common Law, 183-262.) Questions of fact in this country, where there is a constitutional right to a jury trial, are for the jury, while questions of law are ordinarily for the judge. In the field of negligence it is common practice for the jury to determine not only the facts but the standard of conduct to be applied within the compass of the rule that the conduct prescribed must be that of a reasonably-prudent man under the

circumstances. To determine whether given conduct should impose liability or bar a recovery is to make law. If the court has formulated a standard of reasonable conduct that is applicable to the case, the jury's sole concern is to determine whether a person's conduct has met that standard, a question of fact. If the court has not formulated such a standard, it becomes the jury's responsibility to do so, and thereafter to determine whether a person's conduct has met that standard. The decision as to whether the standard should be fixed by the court or left to the jury rests with the appellate courts and turns upon whether the jury would be at an advantage in arriving at a standard by virtue of being a cross-section of the community and therefore representative of the community views and attitudes. (See *Clinkscales* v. *Carver*, 22 Cal.2d 72 [136 P.2d 777]; *Sioux City & Pacific R. R. Co.* v. *Stout*, 17 Wall. (84 U.S.) 657, 664 [21 L.Ed. 745]; *Grand Trunk Railway Co.* v. *Ives*, 144 U.S. 408, 417 [12 S.Ct. 679, 36 L.Ed. 485]; Restatement: Torts, § 285; Holmes, The Common Law, 120-129; Holmes, *Law in Science and Science in Law*, 12 Harv.L.Rev. 443, 457.)