[Civ. No. 5190.    Fourth Dist.    Aug. 23, 1956.]

JOSEPH Z. GONSALVES, Respondent, v. JOHN J. COITO et al., Appellants.

Derby, Cook, Quinby & Tweedt and Higgs, Fletcher & Mack for Appellants.

John Gerald Driscoll, Jr., for Respondent.

BURCH, J. pro tem.*—On June 30, 1953, plaintiff's right hand was bitten off above the wrist by a large fish, presumably a shark. At the time, he was a member of the crew and a fisherman on the "Gem of the Sea," a commercial tuna boat, owned by the defendants.

The jury returned a verdict for plaintiff for $50,000 after deducting $25,000 from total damages of $75,000 because of plaintiff's contributory negligence.

It is alleged in the complaint that said vessel and its crew were engaged in catching live bait in Chame Bay within the territorial waters of the Republic of Panama. Defendants' answer admits these allegations of the complaint:

"That it was the duty of defendants to provide plaintiff with a safe and seaworthy vessel and appliances and to keep the same in a safe condition; to furnish plaintiff with a safe place in which to work; to furnish him with reasonably safe and seaworthy tools and appliances and to keep the same in a safe condition; to furnish plaintiff with a sufficient number of competent co-employees and superior officers; to promulgate and enforce proper and safe rules for the safe conduct of said work and to warn the plaintiff of the dangers arising and to be encountered in connection therewith."

The complaint charges that plaintiff's injuries were proximately caused by the breach of those duties admittedly owing by defendants.

The record indicates that the crew had been engaged throughout the day in filling the bait tanks with live bait which the men seined in the shallow waters toward the shore and brought back to the mother ship anchored in deep water. That on the last trip the ship's bait tanks were filled and a surplus remained over. The men were ordered to deliver the surplus to the "Coimbra," a tuna boat anchored near the "Gem of the Sea." While undertaking this mission, plaintiff received his injury.

The bait gear consisted of a receiving box, two skiffs and a motorboat. On the particular occasion, the motorboat towed the receiving box with 40 feet of water between them, and a

<hr>

*Assigned by Chairman of Judicial Council.

skiff was attached to the stern of the receiving box by a tow rope of some 12 to 15 feet. The bait was in the receiving box. The ropes kept the receiving box high enough in the water to prevent the bait from swimming away. That end could be effected by keeping the lines sufficiently taut. If either line became slack, the end of the receiving box to which that line was attached would drop below the surface and the bait would swim away.

Plaintiff testified that after the voyage started to the "Coimbra," the motorboat slowed up, the box dipped forward, the motorboat speeded up to overcome the forward dip and that movement, in turn, lifted the bow and depressed the stern of the receiving box; that to overcome this development, plaintiff reached for the tow line at the bow of the skiff and lost his hand. During the day a different and more effective way of keeping the receiving box up had been used. This method was to attach the two skiffs to the box, one fore and one aft, and tow them, thus closely attached together, with the motorboat. Possibly a slower but surely a safer movement in the light of avoiding the necessity that the crew expose their flesh to the rapacious maneaters of the sea. The record also discloses that sometimes barrels or other outrigging are used to keep the box from being flooded.

It is not surprising that a young seaman of 20 in the bow of the skiff aft should, in the line of duty, reach spontaneously to tighten the line and lift the bait box. The unfortunate fact is that through want of provision of care or skill on the part of his superiors, he was called upon to make the instinctive move that cost him his hand.

As in *Rouchleau* v. *Silva*, 35 Cal.2d 355 [217 P.2d 929], the trial here proceeded upon the theory of negligence as set out in the Federal Employer's Liability Act under the Jones Act. The jury has rendered a verdict based upon negligence which might be found upon the facts stated above. "The decisions (under the Jones Act) . . . indicate that the findings supported by competent evidence should not be upset except for manifest error or unless they are clearly wrong." (*Rouchleau* v. *Silva*, 35 Cal.2d 355, 358, 359 [217 P.2d 929].) But defendants argue that the proximate cause of plaintiff's injuries was the fish bite, which, they say, was not foreseeable, and from which they conclude that defendants' breach of duty owing to plaintiff, which the jury has found, is error as a matter of law. We think the argument lacks merit.

Prevision is justly an element in determining remote as against proximate cause. There must be a wrong to plaintiff to support the action. ''Proof of negligence as in the air so to speak, will not do.'' ''Negligence is the absence of care according to the circumstances.'' ''The ideas of negligence and duty are strictly correlative.'' (*Palsgraf* v. *Long Island R. Co.*, 248 N.Y. 339 [162 N.E. 99, 59 A.L.R. 1253.] With these principles in mind, we come back to plaintiff's case. Defendants admit the duty to protect plaintiff's safety by the exercise of ordinary prudence as regards both seaworthy appliances and reasonable skill in those who direct his labors. Plaintiff has offered evidence of negligence in the conduct of the operation by the assistant engineer in the face of knowledge which could be charged to him on the record.

In *Mosley* v. *Arden Farms Co.*, 26 Cal.2d 213, 217 [157 P.2d 372, 158 A.L.R. 872], the rule is stated:

'' 'In other words, the actor's conduct must always be gauged in relation to all the other material circumstances surrounding it and if such other circumstances admit of a reasonable doubt as to whether such questioned conduct falls within or without the bounds of ordinary care then such doubt must be resolved as a matter of fact rather than of law.' (*Toschi* v. *Christian*, 24 Cal.2d 354, 360 [149 P.2d 848].) ''

At page 218 of the Mosley case the court speaks of proximate or legal cause thus:

''Viewing the issue as one of proximate or legal cause, and conceding there was some intervening agency in the chain of causation, such agency was not a superseding one exonerating defendant, because, as we have seen, what occurred was reasonably foreseeable, and should have been anticipated. Certainly, when that is true the intervening agency does not break the chain of causation.''

Here no human agency intervened. The matter was properly left to the jury.

The court instructed the jury:

''You are instructed that the motor vessel Gem of the Sea at the time of the accident involved in this case was enrolled and licensed under the laws of the United States. As such, said vessel was subject to Federal laws respecting officers and crews. One of such laws is as follows: 'No person shall be engaged to perform or shall perform on board any vessel to which this section applies, the duties of master, mate, chief engineer or assistant engineer, unless he holds a license to

perform said duties. . . .' If there was a violation of this law by defendants, it was negligence as a matter of law, but such negligence is a matter of no consequence in this case unless it was a proximate cause of the injury to plaintiff.''

At the time of the injury, the speedboat was being operated by Arlo Ernst, the assistant engineer, who was not licensed under the federal law. Defendant argues that the instruction was erroneous and misleading because ''there wasn't the slightest bit of evidence of any connection between Arlo Ernst's duties as assistant engineer and his operation of the speedboat at the time of the injury.'' We think the jury might infer from plaintiff's testimony stated above that the irregular speed of the motorboat created the emergency with which plaintiff tried to cope when injured. Ernst, himself, testified that it was getting late and darkness itself was a hazard to the operation; that the crew had not had supper; that had the larger skiff been tied ''crosswise'' flush with the stern of the receiver ''greater steadiness'' would result. We are not prepared to say that the operation did not call for engineering skill. In this view, the instruction was not misleading and was properly given.

■ Testimony of plaintiff's father, a fisherman, was received, over objection, as to his earnings in 1954. This evidence was admitted for the sole purpose of showing what fishermen generally earn in the particular trade in which the plaintiff was engaged. The witness and plaintiff, as fishermen, received no wages but were compensated, instead, by a share of the proceeds resulting from the fishing venture. This is commonly known as a ''lay plan'' (*Ancich* v. *The Marsha Ann*, 92 F.Supp. 929). We believe there was probative value in the evidence and no error appears from its admission. The jury could properly be informed as to the earnings of others employed in circumstances more or less similar though no wage scale is available.

■ During the closing argument, plaintiff's attorney stated, as follows:

''They say next that this was an operation that was normal, and we have not shown that with this sort of an operation other people have been bitten by sharks. If I had attempted to show that, as I could, Mr. Fletcher would have arose and objected at length to this court at the introduction of such evidence.''

Mr. Fletcher then stated: ''I will ask, your honor, I think that is prejudicial.''

The court ruled: "Well, it is counsel's conclusion as to what would happen. Whether it would or not is something they can draw their own conclusions about."

Thereafter, in a motion for a mistrial, it was argued to be a statement that there were other alleged incidents of biting by sharks, which was unsupported by the record. The court denied the motion and indicated that no bad faith in making the remark was apparent to the court. The necessity of safety precautions because of the presence of sharks in these waters was in evidence. Calling this to the jury's attention was no breach of trial ethics. The need to inform a jury of ordinary citizens of attendant dangers hardly existed. Since it is not necessary to prove the obvious, it may well be, as the attorney suggested, the offer of such evidence would be followed by objections and court rulings to delay the trial. The challenged statement may be subject to the interpretation that counsel was wilfully refraining from the use of available evidence of cases similar to this one, but that appears to us to change the meaning intended by the speaker. We agree with the trial judge that no prejudicial misconduct resulted.

The judgment is affirmed.

Barnard, P. J., and Mussell, J., concurred.

A petition for a rehearing was denied September 11, 1956, and appellants' petition for a hearing by the Supreme Court was denied October 17, 1956. Schauer, J., was of the opinion that the petition should be granted.