[Civ. No. 28517.   Second Dist., Div. Three.   June 30, 1966.]

BILLY BRYAN GRIMES, as Executor, etc., et al., Plaintiffs and Appellants, v. SOUTHERN PACIFIC COMPANY, Defendant and Respondent.

Vaughan, Brandlin, Robinson & Roemer and Mark P. Robinson for Plaintiffs and Appellants.

Randolph Karr and William E. Still for Defendant and Respondent.

FRAMPTON, J. pro tem.*—On February 6, 1961, Cora I. Grimes, William Grimes, and Gamiliel Grimes Wessell filed an action in the Superior Court of Los Angeles County against the Southern Pacific Company (hereinafter Railroad) and

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

the City of Los Angeles wherein they sought damages for the alleged wrongful death of one Vernon W. Grimes (hereinafter Grimes). Cora was the surviving wife and William and Gamiliel were the surviving children of Grimes.

During the course of the trial the defendant, City of Los Angeles was dismissed upon motion of the plaintiffs. On December 2, 1964, after the entry of judgment below and pending this appeal Cora died and Billy Bryan Grimes as executor of Cora's estate was substituted as a party plaintiff in the place and stead of Cora.

The cause proceeded to trial before a jury and at the conclusion of plaintiffs' case, upon application of the Railroad, the trial court granted a motion for a judgment of nonsuit and thereafter entered a judgment based upon such motion. The appeal is from this judgment.

▇▇ In determining whether the granting of the nonsuit was proper, this court must resolve every conflict in the evidence in favor of the plaintiffs, we must consider every inference which can reasonably be drawn and every presumption which can fairly be deemed to arise in support of plaintiffs and accept as true all evidence adduced, direct and indirect, which tends to sustain the plaintiffs' case. (*Coates* v. *Chinn,* 51 Cal.2d 304, 306 [332 P.2d 289].)

The Railroad does not challenge the plaintiffs' version of the evidence as set forth in their opening brief and we therefore accept this version as a fair summary of the state of the evidence before the trial court at the close of plaintiffs' case.

According to the plaintiffs' version of the evidence, Grimes was killed in a railroad crossing accident on August 24, 1960, at approximately 1:05 a.m., Pacific Daylight Saving Time. Just prior to the accident he had been traveling in his automobile southbound on Reseda Boulevard from its intersection with Parthenia Street in the City of Los Angeles, at which time he was struck at a grade crossing by a westbound train owned and operated by the Railroad. The accident occurred at a crossing commonly known as the Reseda Crossing, situated near the Railroad's Northridge Station. Grimes, at the time of the accident, was 63 years of age. He was on duty in the course of his employment as a night patrolman and was driving a 1960 Dodge automobile. It was agreed that just prior to the time of the accident he was driving his vehicle in a southerly direction on Reseda Boulevard at the intersection of Parthenia Street. At this intersection the Railroad right-of-

way and the tracks run, according to common railroad parlance, in an easterly and westerly direction, San Francisco being west and Los Angeles being east.

At the time of the accident there were four sets of railroad tracks which crossed over Reseda Boulevard. The main tracks upon which the accident occurred were third in order from the north boundary of the Railroad right-of-way. The other three sets of tracks were designated as a switch track, a house track and an industry track. The tracks other than the mainline tracks were made necessary because of switching operations carried on by the Railroad in the vicinity of the Northridge Station. To the east of the crossing at a distance of approximately 80 feet from the east curb line of Reseda Boulevard was a station building known as the Northridge Station. This building, as well as trees growing upon the station grounds, interfered with the view of motorists approaching the tracks from the north and looking to the east.

At the time of the accident Parthenia Street, to the east of Reseda Boulevard, ran in an east-west direction, generally parallel with the railroad tracks and on the north side of the railroad right-of-way, it then made a ''Z'' type crossing of Reseda Boulevard and the railroad tracks and continued on in an east-west direction to the west of Reseda Boulevard on the south side of the railroad right-of-way. At this intersection and at the railroad crossing there were traffic signals and traffic protection signals as follows: On the north side of the tracks there were regular tri-light type signals which governed traffic southbound on Reseda Boulevard. These signals were located one on the northwest corner and one on the southwest corner of the northernmost intersection of Reseda Boulevard and Parthenia Street. There was also a Number 8 flashing light protection signal which consists of a center standard type post equipped with a bell and two red lights that flash on and off alternately when the signal is activated by the presence of a train upon the tracks within certain specified distances from the crossing. The latter signal is situated approximately 80 feet north of the mainline track. On the south side of the tracks there was identical equipment situated at the southerly boundary of the south extension of Parthenia Street with the Number 8 flashing light located about 50 feet south of the most southerly track. The distance between the outer rails of the most northerly and southerly tracks is approximately 50 feet. At the time of the accident the tri-light signals and the Number 8 flashing signals were so coordinated that activation

of the Number 8 flashing signals would result in activating the tri-light signals. The activation of the signals at the crossing would occur when railroad equipment of some kind would move into the mainline electrical circuit at any point within 3,500 feet east or west of the crossing. The Public Utilities Commission Order 75B, in effect at the time of the accident, required that the Number 8 flashing light should be operated for a minimum of 20 seconds but not to exceed 30 seconds for the highest speed train to be run on this particular division of the railroad. That is to say, that the circuit should be so positioned on the mainline track that motorists would be presented with a warning signal for not less than 20 seconds and not more than 30 seconds when the highest speed train on the railroad division entered the circuit coming toward the crossing. This particular circuitry was located only on the mainline track and was not located on any of the other three tracks which crossed Reseda Boulevard.

At the time of the accident there was a "crossing track circuit" located at a point somewhere between 50 and 100 feet both east and west of Reseda Boulevard and which operated upon all four tracks. The crossing track circuit had several functions. It acted as a cut-out circuit for trains moving on the mainline so that when the last car of a particular train moved across Reseda Boulevard and had activated the crossing track circuit, it would cut off the mainline circuit which had been operating the warning device. On the three tracks other than the mainline track the crossing track circuit would serve to activate the warning device when any piece of railroad equipment entered and remained within the field of the two circuits on the east and west side of Reseda Boulevard. At the time of the accident there were no crossing gates at the crossing but such gates were then in the process of being installed.

The train involved in the accident consisted of two diesel locomotives, each approximately 50 feet in length, 11 mail and express cars, each approximately 70 feet in length, and one passenger car, approximately 60 feet in length. The train was traveling in a westerly direction from Los Angeles to San Francisco at a speed estimated at between 60 and 70 miles per hour as it reached the crossing. At the time of the collision, Grimes was seen driving his vehicle across the tracks from the north to the south at a speed estimated to be between 5 and 10 miles per hour.

After the collision, Grimes' vehicle was found approxi-

mately 80 feet west of the center of the crossing and the rear car of the train was some distance west of the crossing. A statement attributed to the engineer of the train was that "As I approached the crossing at Reseda Boulevard, I sounded the warning horn and I noticed the wigwag was working and the red light was flashing and then I saw the car coming south on Reseda. He was going slow and he didn't attempt to stop and he drove right in front of the engine and the front of the engine struck the car. I brought the train to a stop as soon as possible and backed up the train." There was no wigwag signal at the crossing at the time of the accident. Neither the engineer nor anyone connected with the train indicated to Officer McLaughlin, a police officer who investigated the accident, that there had been any application of the brakes on the train prior to the collision.

Leslie E. Corkill, an employee of the City of Los Angeles connected with the Department of Public Utilities and Transportation, testified in substance that part of his job was to make investigations of railroad crossings and in some cases to recommend improvement in crossing protection. That the Reseda Boulevard crossing had been the subject of discussions between the City of Los Angeles, the Railroad and the Public Utilities Commission for at least six years prior to the date of the accident. Studies had shown that as early as 1956 Reseda Boulevard had become a heavily traveled thoroughfare. As early as 1954, the City of Los Angeles requested a reduction in the speed of trains operating over the Reseda crossing to 35 miles per hour. As of the time of the accident, The Santa Fe, Union Pacific and Pacific Electric Railroads, operating over crossings within the City of Los Angeles, did not operate their trains at speeds of 60 to 79 miles per hour as did the Southern Pacific. Most of them operated their trains at city crossings at 25 miles per hour. That the Southern Pacific did not give instructions to reduce the speed of trains at the Reseda crossing until after the accident. An investigation in 1956 revealed that automobile traffic at the Reseda crossing was being stacked up due to the operation of the various signal devices when trains were in the vicinity of the crossing. Since 1956, various investigations were made by the City concerning traffic protection. Meetings were held at the scene by representatives of the City of Los Angeles, representatives of the Railroad and sometimes with representatives of the Public Utilities Commission in an attempt to remedy the problems at the crossing.

One of the problems was that railroad switching movements, carried on at various times throughout the day and night, in the vicinity of the crossing would activate the railroad warning signals and the regular tri-light signals in such manner that they would remain in operation for periods of time ranging from several minutes to 28 minutes. It was not unusual for switching operations to be conducted at all hours of the day or night. These facts were pointed out to the Railroad and it was indicated to its representatives that a danger existed in that motorists did not know whether to stay in a stopped position or attempt to cross over the tracks in the face of the warning signals. In early 1957, at one of these meetings, a tentative agreement was entered into that trap circuits would be installed by the Railroad to time out the signals after a predetermined time, but nothing in this direction was done. In early 1959, the City of Los Angeles urged the Railroad to put crossing gates at this crossing and to couple the gates with calibrated speed circuits. This is a type of circuit which activates and deactivates the crossing protection devices in relation to the rate of speed at which a train is moving toward the crossing so that the time of activation is approximately equal whether the train is running at a high rate of speed or at a low rate of speed.

The Railroad resisted recommendations for the improvement of the existing safety facilities over a period of approximately three years prior to the date of the accident during which time the representatives of the City of Los Angeles and the Public Utilities Commission repeatedly urged the installation of better crossing protection at the Reseda crossing and the City of Los Angeles agreed to pay one-half of the cost of such installation. Mr. Corkill testified that on March 16, 1959, he sent a written notice to the Railroad in which he outlined the reasons for the installation of the crossing gates as being (1) the increase of traffic at the crossing, (2) the fact that train speeds at the crossing were as high as 79 miles per hour, and (3) that the Public Utilities Commission had previously recommended that gates be installed at all heavily traveled crossings where high speeds were involved in order to reduce accidents. He testified further that several times after March 1959, he requested the Railroad to indicate their willingness to install crossing gates at Reseda Boulevard and that on or about June 22, 1959, the Public Utilities Commission sent a letter to the Railroad again recommending the installation of gates and calibrated speed circuits. The Public Utilities Com-

mission also complained about the delay of the Railroad in doing anything about the crossing protection at Reseda Boulevard.

Again, in November 1959, the Public Utilities Commission complained to the Railroad that not only had there been no improvement of the crossing protection at the Reseda crossing, but that the Railroad had not answered the last letter of the commission directed to it. In January 1960, the City of Los Angeles gave written notice to the Railroad that it was ready, willing and able to spend one-half of the cost of the installation of gates at this crossing.

About the middle of 1960 the Railroad commenced work on the installation of crossing gates at the Reseda crossing. Mr. Travis, the railroad's signal supervisor, testified that the decision to install crossing gates is predicated upon factors of safety to automobile traffic. At no time during the progress of this work, up to the time of the accident, were instructions given to train crews to reduce their speeds at the Reseda crossing. Up to the time of the accident the speed limit remained at 79 miles per hour for passenger trains and 55 miles per hour for freight trains.

The engineer of the train here involved, Mr. Livengood, testified by deposition taken under the provisions of section 2055 of the Code of Civil Procedure, that he was on the so-called "extra board" as a substitute engineer and had operated freight trains over this route before, but that this was the first time he had operated a passenger train over the route. He testified that on some crossings within a city limit on this route there were special instructions to reduce speed but there were no such instructions for the Reseda crossing. He testified further that he was traveling "pretty close to the allowed" speed of 79 miles an hour just before the collision. That he saw the headlights of the decedent's vehicle moving very slowly towards the tracks before the engine of the train arrived at the depot. He estimated the depot to be 300 to 400 feet east of the intersection and estimated the train's position at that time to be about halfway between the Reseda crossing and the crossing next east of Reseda or about one-quarter of a mile. He testified further that when he saw the headlights of the decedent's vehicle moving toward the tracks he made a "service application" of the brakes but that he did not apply the emergency brakes until he was approximately 500 feet from the crossing. He testified further than the engine of the train struck the left front portion of the decedent's vehicle and the train then

went past the intersection and came to a stop approximately one-quarter of a mile west of the intersection.

The fireman of the train, Mr. Riesen, called under the provisions of section 2055 of the Code of Civil Procedure, testified that he did not know at what speed the train was traveling as it approached the crossing, that he thought the engineer made a service application of the brakes before the collision but did not see him do so, and that he did not feel any reduction in the speed of the train before the collision. He testified that from the cab of the engine a wigwag would be distinguished from a flashing Number 8 light in that a wigwag can be seen oscillating, while a Number 8 flashing light can only be observed as a ''peep hole'' of light in the side of the unit.

The conductor of the train, Mr. Allbritton, called under the provisions of section 2055 of the Code of Civil Procedure, testified that he had worked as a railroad man for 40 years; that from his experience he could tell the difference between a standard stop and an emergency stop on a train such as the one here involved, and that the engineer did not make an emergency stop. He testified further that the brakes of the train were not applied, in his opinion, until after the train had passed through the crossing and that the stop that was then made was a standard stop. That the time table and special instructions in effect at the time of the accident permitted a speed of 79 miles per hour at the Reseda crossing, and that no special instructions were given to train crews to reduce speed at this crossing until after the date of the accident.

Dan Boykin, the Assistant Superintendent of the Los Angeles Division of the Railroad, called as a witness under the provisions of section 2055 of the Code of Civil Procedure, testified that the time table in effect at the time of the accident described the location of the accident as Northridge or mile post 449.9; that at 'this location one of the siding tracks was used to take inferior (e.g. freight) trains off the main track so that superior trains could pass through, and that the siding tracks extended to the west a distance sufficient to handle about 52 freight cars. He testified further that the trains in this division stay on Standard Time as far as their printed schedule is concerned, but run one hour later during Daylight Saving Time. That train number 91 (the train here involved) was due at the Reseda crossing at 11:45 p.m. Standard Time or 12:45 a.m. Daylight Saving Time. That a freight train coming from Santa Barbara was due to arrive at the crossing at 12:23 a.m. and that it would customarily be sided to permit

train number 91 to go through on the main track. That the place where the eastbound train would be sided would vary from day to day depending upon whether train number 91 was on schedule, and that the further train number 91 was behind schedule, the closer to Los Angeles the eastbound freight would come before being sided.

Mr. Francis Mintz, the only eyewitness to the accident, called by the plaintiffs as their witness, testified that he was an attorney at law, and lived in the Northridge area. That he had been over the Reseda crossing many times before August 24, 1960. That he had been to a business meeting in the general vicinity and when the meeting had terminated he proceeded in his automobile over to Reseda Boulevard, entering thereon from Bryant Street, which is one block south of the railroad crossing, a distance estimated to be approximately 500 to 600 feet. The front window of his vehicle was down. Just before turning onto Reseda Boulevard he heard a train horn but did not know from which direction the train was coming. That he proceeded north on Reseda Boulevard, at 20 to 25 miles per hour, to a point opposite the flashing red signal (tri-light) at the south boundary of Parthenia Street and that he then moved forward to the stop line just to the south of the railroad warning signal. There was a bell ringing and a red light flashing at the south signal. By the time he had stopped his vehicle he had heard the train horn intermittently and had also heard the engine of the train, and then realized that the train was coming from his right (east to west), but he could not see the train because a building obstructed his view. He found it difficult to estimate the length of time that he was stopped before the train came into his view, but said it was less than one minute. He observed the train out of the corner of his eye as he was looking to the north, and at this point the train was just entering the intersection. He first noticed the engine headlight as the train came into view and he estimated the speed of the train as being between 60 and 70 miles per hour. At approximately the same instant that he observed the train he saw the decedent's automobile moving southward at a point just "barely," about "a foot or something like that," north of the track on which the accident occurred. It was his impression that the accident occurred on the second track from the north side of the crossing. It was his impression also that the decedent's automobile was traveling at a speed of 5 or 10 miles per hour, and that the initial point of impact with the vehicle was just forward of the post of the front car door. He

did not recall hearing the bell of the train nor did he observe any slowing movement of the train or hear any sound which would indicate the application of the train's brakes.

Mintz testified further that on previous occasions, when he had stopped at the stop line opposite the railroad signal on the north side of the tracks he noticed that his unobstructed view of the tracks to the east extended about 200 feet. That on many occasions prior to the date of the accident he had approached the crossing from both the north and south side and had observed that the railroad crossing signals would be activated and in operation for several minutes during which time no train would cross through the intersection.

With this state of the evidence the trial court granted the nonsuit upon the grounds that the testimony disclosed that Grimes was guilty of contributory negligence as a matter of law, relying upon the case of *Aguilera* v. *Atchison, T. & S.F. Ry. Co.*, 188 Cal.App.2d 274 [10 Cal.Rptr. 367] in support of its ruling.

Grimes, at the time of the accident, was clothed with the disputable presumption that he was exercising ordinary care for his own safety. (Code Civ. Proc., § 1963, subd. 4.) His heirs were entitled to the benefit of the presumption until the evidence offered by them was sufficient to dispel it. "Stated in the affirmative, the rule is that if plaintiffs' own evidence, not the result of mistake or inadvertence, does unerringly point without contradiction to contributory negligence on the part of claimants' deceased, which proximately contributed to the injury complained of, and when a reasonable person could come to no other conclusion, then there is no place for the presumption. It is displaced by such conclusive evidence and a nonsuit is proper." (*Aguilera* v. *Atchison, T. & S.F. Ry. Co., supra,* at p. 278.) The testimony of the witness Mintz was the only evidence offered by the plaintiffs which could be considered and weighed by the trial court as tending to dispel the presumption of due care upon which the plaintiffs were entitled to rely.

The negligence, if any, of the Railroad in maintaining an alleged inadequate type of warning at the crossing, in permitting its trains to enter and cross the intersection at speeds up to 79 miles per hour and in conducting its switching operations upon and across the crossing in such manner as might cause motorists to attempt a crossing in the face of activated and operating warning devices is not here involved except insofar as the conduct of the Railroad may have a bearing on

the question as to whether, under all of the circumstances here shown, the conduct of Grimes can be said to constitute contributory negligence as a matter of law.

If it can be said that the evidence discloses that Grimes exercised no care whatsoever, that he drove blindly ahead, heedless of his own safety, then he was guilty of contributory negligence as a matter of law. However, "Standards of care are typically relative; rules of law are basically absolute. Hence, in regard to negligence, any attempt to screen factual conduct into legal classifications through a sieve of absolute law will be impracticable whenever the related circumstances admit of materially conflicting inferences. ▇ In other words, the actor's conduct must always be gauged in relation to all the other material circumstances surrounding it and if such other circumstances admit of a reasonable doubt as to whether such questioned conduct falls within or without the bounds of ordinary care then such doubt must be resolved as a matter of fact rather than of law." (*Toschi* v. *Christian,* 24 Cal.2d 354, 360 [149 P.2d 848].)

▇ It is settled that where it is shown that a plaintiff has exercised some care, the question whether or not the care actually exercised was due and sufficient will always be a matter for determination by the jury. (*Koch* v. *Southern California Ry. Co.,* 148 Cal. 677, 680 [84 P. 176, 113 Am.St.Rep. 332, 7 Ann.Cas. 795, 4 L.R.A. N.S. 521] ; *Toschi* v. *Christian, supra,* at p. 361; *Lloyd* v. *Southern Pacific Co.,* 111 Cal.App.2d 626, 634 [245 P.2d 583] ; *Startup* v. *Pacific Electric Ry. Co.,* 29 Cal.2d 866, 871 [180 P.2d 896].)

▇ The decedent had been over the Reseda crossing in his work almost daily. The jury, therefore, could have inferred from this circumstance that the decedent was familiar with the switching operations carried on by the Railroad upon and adjacent to the crossing and the operation of the warning signals during such operations.

The evidence, viewed in the light most favorable to the plaintiffs, shows that the warning devices maintained and operated by the Railroad at the time of the accident, and for a long time prior thereto, were activated and were kept in operation for periods of time from several minutes to 28 minutes during switching operations carried on in the vicinity of the crossing during both the daytime and the nighttime, and that on many of these occasions while the warning devices were in operation no train would cross the crossing. The jury could reasonably infer from these circumstances that the driver of a

motor vehicle who was familiar with the switching operations of the Railroad at this intersection would find many times that such signals remained in operation when in fact there was no danger from approaching trains, and that such driver could, where his view of the tracks is partially obstructed, without being negligent as a matter of law, pass beyond the railroad flashing signals and approach the rails with caution in an effort to get a better view of the track to see whether or not a train, in fact, presented a hazard to his crossing the right-of-way in safety.

In the case at bench the jury could reasonably infer from all of the facts and circumstances surrounding the accident that Grimes was using some care for his own safety. These facts and circumstances may be generally summarized as follows: (1) Grimes was familiar with the crossing and was therefore familiar with the switching operations carried on there and the consequent operation of the warning signals which were activated for long periods of time without the passage of a train over the crossing, (2) he had brought his vehicle to a stop at the tri-light signal located some 200 feet north of the mainline track (Code Civ. Proc., § 1963, subds. 1 and 4), (3) his view of the tracks was partially obstructed by the railroad station located some 80 feet east of the crossing, and (4) after having traveled some 200 feet from a stopped position his rate of speed was less than 10 miles per hour after having crossed two sets of switching tracks and while approaching the mainline track.

The evidence being such that it will reasonably support the inference that Grimes was using some care for his own safety, the question as to whether or not the care actually used by him was due and sufficient became a question of fact for the determination of the jury. It was therefore error under the circumstances here shown to have granted a nonsuit.

The judgment is reversed.

Ford, J., and Kaus, J., concurred.