In the

# United States Court of Appeals

## For the Seventh Circuit

No. 02-1041

LORETTA M. ALIOTTA,

*Plaintiff-Appellant*,

*v.*

NATIONAL RAILROAD PASSENGER CORP., et al.,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Central District of Illinois.
No. 99 C 2034—**David G. Bernthal**, *Magistrate Judge*.

ARGUED SEPTEMBER 19, 2002—DECIDED JANUARY 3, 2003

Before CUDAHY, DIANE P. WOOD and WILLIAMS, *Circuit Judges*.

CUDAHY, *Circuit Judge*. Loretta Aliotta, widow and executor of the estate of Joseph Aliotta, appeals an adverse judgment in a wrongful death lawsuit against the National Railroad Passenger Corporation (Amtrak), the Illinois Central Railroad Company (IC) and Gary Gilmer, an Amtrak engineer. A jury verdict was entered against her in the Northern District of Illinois after the case was

removed to federal court by Amtrak.[1] Loretta argues that she was unfairly prejudiced by certain rulings on evidence and jury instructions. Finding critical jury instructions to be inadequate statements of Illinois law, we reverse and remand for a new trial.

I.

Joseph Aliotta, a 69 year-old former nurse's aide, lived with his wife Loretta in Watseka, Illinois, a town just south of Kankakee near the Amtrak route between Chicago and Carbondale. Two to three times a year for about fifteen years, Joseph would take the train north from nearby Gilman to Chicago to visit his sisters. Two passenger trains operate northbound between Gilman and Chicago, an evening local train from Carbondale to Chicago and a morning express train which originates in New Orleans. In late 1996, Amtrak changed its schedules, and the express train no longer stopped at Gilman.

On July 30, 1997, Joseph Aliotta called Amtrak to find out when the train to Chicago would be at Gilman station, and was told 7:30. Unfortunately for Joseph, this turned out to be the scheduled stop for the *evening* train. Doubly

---

[1] Federal question jurisdiction exists for congressionally incorporated corporations under 28 U.S.C. § 1331. *See Pac. R.R. Removal Cases*, 115 U.S. 1 (1885); *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738 (1824). The limitation to this basis of jurisdiction found in 28 U.S.C. § 1349 (often described as a reaction to *Pacific Railroad*) does not apply to congressionally incorporated entities, such as Amtrak, more than half of whose capital stock is owned by the federal government. Through the interaction of these statutes and cases, federal courts have jurisdiction over all cases involving Amtrak, regardless of the cause of action. *See*, *e.g.*, *In re Rail Collision Near Chase, Md. on Jan. 4, 1987 Litig.*, 680 F. Supp. 728 (D. Md. 1987) (finding federal jurisdiction over Amtrak).

unfortunately for Joseph, the morning train would pass through Gilman almost precisely twelve hours earlier, but without stopping.

On the morning of July 31, Loretta drove her husband to the Amtrak station. After standing with him for a while on the platform, she went back to her car and waited for him to board the train. The train came and passed, without stopping, and she found Joseph dead about 180 feet down the tracks from the platform. What exactly happened to Joseph was a matter of dispute at the trial. Witnesses for the plaintiff said that Joseph was standing on an "island platform" along which the train whizzed by, suggesting that Joseph was impacted by the side of the train or was somehow "sucked under." This platform, the plaintiff argued, is dangerously narrow to stand on while trains are passing, and there were no signs warning passengers not to stand there when waiting for trains. Witnesses for the defendants (the engineers on the passing train) said that Joseph was actually crossing the tracks in front of the train, and was hit head-on.

One defense witness, Thomas Prendergast, a Risk Manager for the defendant IC, stated during his deposition that high-speed trains create dangerous vacuums along and near their sides, which can potentially suck bystanders to their deaths. The trial judge refused to allow this testimony into evidence on the ground that it neither met the requirements for expert testimony under Fed. R. Evid. 702 nor was admissible as an admission of a party-opponent under Fed. R. Evid. 801(d)(2). The plaintiff appeals the exclusion of Prendergast's statements on the ground that they qualified as admissions under Fed. R. Evid. 801(d)(2)(D). The plaintiff also appeals the trial judge's exclusion, on the ground that there was a danger of unfair prejudice, of a photograph of the deceased's battered body. Fed. R. Evid. 403. The plaintiff contends that the condi-

tion of the body is probative of its position when struck by the train.

Finally, the plaintiff finds fault with several of the jury instructions relating to the appropriate duties of care to be exercised by the parties.

## II.

We review a district court's evidentiary rulings for an abuse of discretion. *United States v. Colston*, 936 F.2d 312, 317 (7th Cir. 1991). We review jury instructions with deference, analyzing them as a whole to determine if they accurately state the law and do not confuse the jury. *Maltby v. Winston,* 36 F.3d 548, 560 (7th Cir. 1994). In this analysis, we must first determine whether the instructions in question misstate the law or fail to state it fully. If this requirement is met, we then determine whether the inadequate statements confused or misled the jury causing prejudice to a litigant. *Id.* The parties agree that we should apply Illinois law to substantive issues. *See Hollus v. Amtrak Northeast Corridor*, 937 F. Supp. 1110, 1114 (D.N.J. 1996) (explaining that the reach of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), extends beyond diversity actions to cover federal question jurisdiction cases in which there is a state law cause of action).

## A.

In his deposition, Thomas Prendergast, Risk Manager for the IC, made statements highly damaging to his employer's interests:

> Well, the train is so large, it creates a vacuum right next to the train. And that vacuum will pull a person towards the train who is standing too close. You would think it would blow you away from the train, . . . [b]ut

it's just the opposite. It would actually pull you in closer to the train. If you were standing within a few feet of a passenger train going 79 miles an hour, there's a very good chance that you would be killed. Even though you would be trying to resist that, falling near the train, you would be pulled right in.

. . .

Certainly, [you] would be pulled in if the train went by that station at 79 miles an hour and [you] were standing on the yellow line or any closer than that yellow line, certainly [you] would be pulled into the train and a good chance that [you] would be injured.

Prendergast Dep. at 46-47, 51. According to the plaintiff's witnesses, Joseph Aliotta was standing on an "island platform" which had tracks running on both sides but was only five feet wide, too narrow even to bother painting yellow warning lines (as such lines would leave a pathetically narrow space in which to stand). This "vacuum theory" (apparently related scientifically to the Bernoulli effect) as presented by Prendergast became the plaintiff's principal theory of Joseph's demise and a key component of her attempt to show as negligent those responsible for building the platform and failing to instruct passengers not to stand on it while waiting for trains.

The defendants made a motion in limine to preclude the plaintiff from presenting Prendergast's testimony at trial, resting their argument on two grounds: Prendergast is not qualified to offer expert scientific testimony under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Prendergast's employment with the IC is not such as to make his statements admissible as admissions under Fed. R. Evid. 801(d)(2)(D). The district court agreed with the defendants on both grounds and prevented the plaintiff from introducing the deposition testimony. Just as Prendergast's deposition

statements were excluded on two distinct grounds, we note that there are two different ways in which Prendergast's testimony could have been admitted. It could be admitted for the truth of the matter asserted in it, requiring the trial court to consider both the reliability of the science, pursuant to *Daubert* and Rule 702, and any hearsay issues. Or it could be admitted solely to show that Prendergast's employer, the IC, was aware of certain risks, regardless of those risks' scientific basis. In this latter case, with a limiting instruction to disclaim the statements' scientific validity, there is no *Daubert* or hearsay problem. We will treat these alternatives separately.

1.

Perhaps recognizing the significant hurdle for expert testimony of complying with the *Daubert* standards, the plaintiff fairly early on gave up trying to qualify Prendergast as an expert witness. Indeed, she never even took the procedural step of disclosing him as an expert, Fed. R. Civ. P. 26(a)(2), and does not appeal the district court's ruling that Prendergast in fact does not qualify. We briefly note that this ruling, excluding the deposition testimony as non-expert scientific testimony (having scant indicia of reliability), was correct. The district court took into consideration, among other things, a defendant-submitted report by an engineer demonstrating that any "vacuum effect" would be so slight that a person could not possibly be "sucked in." At a subsequent hearing, Prendergast also backed away from his emphatic deposition claim, explaining that there was no written documentation he could find, from the IC or elsewhere, of the danger of being sucked into the side of a train. Given the scientific nature of Prendergast's statements, and their evident unreliability, the defendants' motion in limine was properly granted. *Daubert*, 509 U.S. at 589 (holding that "the trial judge

must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable").

Prendergast's deposition testimony was thus excluded on the ground that it was scientific evidence but unreliable; the exclusion was not an application of the hearsay rule. Nonetheless, the plaintiff argues that the evidence should be admitted as an admission under Fed. R. Evid. 801(d)(2)(D).[2] But there are complications in this approach. Rule 801(d)(2), on its face, merely defines as non-hearsay certain hearsay-like evidence. The plaintiff directs us to the widely accepted rule that admissions of a party-opponent under Rule 801(d)(2) are accorded generous treatment in determinations of admissibility. *See*, *e.g.*, Fed. R. Evid. 801 advisory committee note (stating that "[n]o guarantee of trustworthiness is required in the case of an admission" and that admissions enjoy "freedom . . . from the restrictive influences of the opinion rule and the rule requiring first-hand knowledge"); *Russell v. United Parcel Serv.*, 666 F.2d 1188, 1190 (8th Cir. 1981) (holding that "firsthand knowledge is not required where admissions are involved"). Despite the scientific but unreliable nature of Prendergast's statements, they might still be admissible if they were Rule 801(d)(2) admissions, and Rule 801(d)(2) admissions were not subject to, or enjoyed freedom from, *Daubert* and Rule 702. The latter is a question the trial court did not reach, since it held that Prendergast's statements do not qualify as party-

---

[2]  Rule 801(d). Statements which are not hearsay.—A statement is not hearsay if—

  . . .

   (2). Admission by party-opponent. The statement is offered against a party and is . . . (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship . . . .

opponent admissions in the first place. We believe that the district court erred in this finding, and that Prendergast's statements do fall within the confines of Rule 801(d)(2)(D). This belief notwithstanding, Prendergast's statements, offered for the truth of the matter contained in them, were appropriately barred.

In this connection, there are two relevant requirements under Rule 801(d)(2)(D). First, Prendergast's deposition testimony must be an admission. Second, the statements must be made "concerning a matter within the scope" of Prendergast's employment.[3] Prendergast's deposition testimony easily meets the first requirement. To qualify as an admission, no specific "against interest" component is required. *See United States v. McGee*, 189 F.3d 626, 631 (7th Cir. 1999) (holding that there is no "requirement that admissions by a party-opponent be inculpatory" and that "the statement need only be made by the party against whom it is offered"). Because the deposition is being offered against the IC, it qualifies as a vicarious admission if it meets the other Rule 801(d)(2)(D) requirement that the statement has to be "within the scope . . . of employment."

Thus, we must ask whether the admission was made within the scope of Prendergast's employment. The law in this area is somewhat muddled because the great bulk of cases interpreting what is within an employee's "scope of employment" deals with employment discrimination. In those cases, many courts, including the Seventh Circuit in *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 950-51 (7th Cir. 1998), have held that the declarant must be involved in the decisionmaking process affecting the employment

---

[3] There is no doubt here that, whatever the scope of his employment, the statements were "made during the existence of the relationship," i.e., he was then (and still is, apparently) a Risk Manager.

action involved (i.e., the declarant must be in management or in the company personnel function) in order for his statements to qualify as having been made within the scope of his employment. The defendants note that the evidence shows that Prendergast served merely in an investigatory capacity; he held no decisionmaking authority with respect to the operation of the railroad.

We agree, however, with the plaintiff that this is a mistaken reading of the case law. Rule 801(d)(2)(D) admissions can be made "concerning [*any*] matter within the scope of the . . . employment." *See* Fed. R. Evid. 801 advisory commitee note, 1972 Proposed Rules (noting that since "few principals employ agents for the purpose of making damaging statements," admissible admissions may be made as to all matters within the scope of the agency or employment and include more than just statements made in circumstances meeting "the usual test of agency"). While the hiring/firing/promoting/demoting decisionmaking authority of the declarant may be critical in employment cases in which the admission deals with hiring/firing/promoting/demoting-type decisions, no similar requirement exists in other contexts. The only requirement is that the subject matter of the admission match the subject matter of the employee's job description.

It clarifies matters to consider how "scope of employment" is defined in other tort claims. To qualify an admission, an employee need only be performing the duties of his employment when he comes in contact with the particular facts at issue. *See Polec v. Northwest Airlines (In re Air Crash Disaster)*, 86 F.3d 498, 536 (6th Cir. 1996) (holding that, where an accident investigation is conducted as part of a vice president's duties, comments made during it are admissions under Rule 801(d)(2)(D)); *Wilkinson v. Carnival Cruise Lines, Inc.*, 920 F.2d 1560, 1566-67 & n.12 (11th Cir. 1991) (holding that it is not within the scope of a cabin steward's employment to know whether a door outside of his work area is defective, where there

is no showing that he "legitimately acquired knowledge of the defective door in the course and scope of his employment, e.g.[,] he [was] ordered to the area in question, or told of the problems with the doors in connection with his duties"). Comments made by an operator of a vehicle or machine about the actions he took in the course of his job also qualify. *See*, *e.g.*, *Grayson v. Williams*, 256 F.2d 61, 66 (10th Cir. 1958) (allowing against his employer a truck driver's admission of high speed); *Martin v. Savage Truck Line*, 121 F. Supp. 417, 419 (D.D.C. 1954) (reasoning that not to allow the vicarious admission of a truck driver would be like requiring "the truck [to have] been operated by an officer or the board of directors of the [c]orporation owning the truck; and trucks are not operated that way").

Prendergast's statements were made within the scope of his employment. Prendergast's job is to investigate accidents, and in doing so, he speaks with other railroad employees in determining the causes and potential causes of train accidents. The "vacuum theory" was knowledge he had acquired during the course of his job. Now, if he had said in his deposition that Joseph had died by being sucked into the side of the Amtrak train, that statement, being a conclusion, may arguably lie just outside of the scope of his employment—his job did not entail, according to the record, drawing such conclusions from the facts he gathered. General information about the causes of train accidents, however, is knowledge and experience gathered and utilized on his job. Further, we do not believe that the fact that the information here is somewhat scientific in nature defeats the fact that it was made within the scope of his employment. While Prendergast is not employed as a scientist, general scientific or mechanical knowledge is undoubtedly learned and applied in the course of his job investigating accidents. Thus, we believe that Prendergast's statements are not hearsay under Rule 801(d)(2)(D) and might, if there were no other objections, be admitted as admissions against the IC.

The question remains whether there are other objections. The plaintiff would have us hold that, as an 801(d)(2) admission, the testimony is admissible regardless of certain other considerations. The 1972 Advisory Committee Notes to Rule 801 quoted above do suggest that admissions are sometimes free from the lay opinion limitations of Rule 701 and the personal knowledge requirement of Rule 602. However, the rules calling for generous treatment of party-opponent admissions still do not stand for the proposition that Rule 801(d)(2) trumps *all other* Federal Rules of Evidence. For example, Rule 403 clearly applies to admissions, and a trial judge can exclude admission evidence if its probative value is substantially outweighed by the danger of unfair prejudice. *See United States v. Zizzo*, 120 F.3d 1338, 1351-52 (7th Cir. 1997). Also, although sequence of adoption is not dispositive, we note that Rule 701(c) was adopted well after the Advisory Committee Notes to Rule 801(d)(2) contemplating freedom from "the opinion rule." *See* Fed. R. Evid. 701 advisory committee note, 2000 Amendments ("Rule 701 has been amended [to include subsection (c)] to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing."). The plaintiff has made no argument why admissions should always be free from the requirements of Rule 701(c), Rule 702 and *Daubert*. And in this particular case, we see no good reason why unqualified and unreliable scientific knowledge should be exempted from the expert evidence rules simply because the speaker is an employee of a party-opponent.[4]

---

[4] Although the need for reliability with respect to scientific subjects is the dominant consideration here, this might not always be the case. Sometimes, credibility based on attribution to the party against whom a statement is used will seem more persuasive because of its damaging quality than less persuasive

(continued...)

Rule 801(d)(2) does not protect Prendergast's unreliable scientific testimony from exclusion under Rule 701(c) and 702, and his statements, as offered for the truth of the matter contained in them (i.e., the existence of a dangerous "vacuum effect"), were properly excluded.

2.

Prendergast's testimony may be inaccurate as a statement of physics, but it could show that the defendant IC was aware of the risks of passengers standing too close to moving trains. In this respect, of course, the deposition testimony would most certainly not be hearsay, since it would not be offered for the truth of the matter it contained. Additionally, it may not be excludable under Rule 701(c) and 702 since it could be accompanied by a limiting instruction disavowing any reliability of the underlying scientific proposition. Admission of the deposition testimony thus limited, even if the plaintiff could not use the statements to assert the existence of a vacuum effect, or to advance the theory that Joseph was sucked in by a vacuum, arguably may have helped her show that the defendants knew the danger of narrow platforms.

After ruling that the deposition testimony would be barred for not meeting the requirements of expert testimony, the trial judge went on to note that the plaintiff might want to introduce the deposition to show "what the railroad knew and . . . acknowledged . . . to be a known risk." Report of Proceedings (Tr.) at 21. Given that this use of the testimony would not propose "to prove the truth of the matter asserted" (the hallmark of hearsay),

---

(...continued)

because of the risk of scientific unreliability. Or justice and equity may demand attribution to a party and admissibility regardless of any Rule 702 considerations.

the district judge did not believe that Rule 801(d)(2) was relevant. *Id.* ("I don't think that the 801 analysis really kicks in because what he testifies to here isn't hearsay."). Judging by the trial judge's statements, however, it was this limited use of the evidence that he barred under Rule 801(d)(2). Of course, Rule 801(d)(2) is not an independent basis for excluding testimony. So, what if we offer a limiting instruction? We believe that Prendergast's testimony, cast in the only form in which it would have been acceptable, may say too little (only that the railroad knew the danger of narrow platforms). All of the jurors knew, by common knowledge and through the actual trial testimony of Prendergast, *see*, *e.g.*, Tr. at 165, that the railroad knew narrow platforms to be a safety risk. Given the collateral nature of this limited basis for introduction of Prendergast's statements, we believe they might properly have been excluded under Fed. R. Evid. 403. *See United States v. Harwood*, 998 F.2d 91, 97 (2d Cir. 1993) (holding that hearsay evidence not offered for the truth of the matter contained can still be excluded for unfair prejudice). For the same reasons, any improper exclusion would have been harmless error.

## B.

The district judge barred the introduction of a photograph of the body of the deceased on the ground that its probative value was substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403. After weighing the appropriate considerations, he acted within his discretion. Tr. at 438 ("[T]here has been no reconstructive testimony as far as based upon the position of the body . . . , so the position of the body in that picture doesn't support any theory of where the decedent was at the time of his being struck by the train."). In weighing the probative against the prejudicial, the discretion of the district court is broad.

C.

The plaintiff also appeals certain rulings on jury instructions: (1) adoption of defendants' instruction number 11, stating Joseph's duty to exercise ordinary care at railroad crossings, (2) rejection of plaintiff's instruction number 3, stating the duty of a common carrier to its passengers, (3) rejection of plaintiff's instruction number 4, stating who is a passenger entitled to an elevated degree of care, and (4) rejection of plaintiff's instruction number 5, stating the duty of a common carrier to exercise an elevated degree of care in selecting a place for boarding. We consider a district court's jury instructions with deference, analyzing them as a whole to determine if they accurately state the law and do not confuse the jury. *Maltby v. Winston,* 36 F.3d 548, 560 (7th Cir. 1994). In this analysis, we first must determine whether the instructions misstate or insufficiently state the law. If the first requirement is met, we then determine whether the inadequate statements confused or misled the jury causing prejudice to a litigant. *Id.*

There is one preliminary matter. Some of the arguments presented by both the plaintiff and the defendants go to the rules governing the giving of Illinois Pattern Jury Instructions (IPIs): Illinois Supreme Court Rule 239(a) dictates that "the IPI instruction shall be used[ ] unless the court determines that it does not accurately state the law." However, the state preference for using IPIs rather than non-IPI instructions is not to be construed as advance approval by the Supreme Court of the IPIs. *Powers v. Ill. Cent. Gulf R.R. Co.*, 438 N.E.2d 152, 157 (Ill. 1982). IPIs are not law, and there are many circumstances which justify modifying IPIs or using non-IPI instructions in place of or in addition to IPIs. *See generally* Ill. Supreme Court Comm. on Jury Instructions in Civil Cases, *Illinois Pattern Jury Instructions, Civil*, 2000 ed., 1-5 (summarizing basic principles in the use of IPIs and non-IPI

instructions). Thus, while we have considered the text of the IPIs and the comments that accompany them in *Illinois Pattern Jury Instructions, Civil*, we will analyze the instructions' legal sufficiency in light of actual Illinois case law.

One issue of jury instructions questions whether Joseph Aliotta's duty of care was overly emphasized. The court gave a defendant instruction which stated a person's duty of care crossing a railroad track, based on *Greenwald v. Baltimore & Ohio Railroad Co.*, 164 N.E. 142, 144 (Ill. 1928).[5] In combination with the plaintiff instruction on comparative negligence,[6] it does appear that Joseph's duties were stated twice. However, the jury instructions were not truly duplicative, since they state distinct legal principles. Both statements were legally accurate, and the plaintiff fails to cite any cases or other evidence suggesting that this degree of overlap is or was prejudicial. We do not believe it was.

The rest of the disputed instructions go to the degree of care owed by the defendants. According to Illinois law, common carriers such as Amtrak owe the highest degree of care to "passengers." *See Rotheli v. Chi. Transit Auth.*, 130 N.E.2d 172 (Ill. 1955); IPI 100.01. With respect to the defendant Amtrak's duty of care, the plaintiff raises

---

[5] Defendants' instruction 11: It is the duty of all persons about to cross a railroad track to look about them and see if there is danger and to take proper precaution to avoid an accident. It is generally recognized that railroad tracks are places of danger and that one crossing tracks must approach them with the amount of care commensurate with the known danger.

[6] Plaintiff's instruction 11: It was the duty of Joseph Aliotta, before and at the time of the occurrence, to use ordinary care for his own safety. A person is contributorily negligent if (1) he fails to use ordinary care for his own safety and (2) his failure to use such ordinary care is a proximate cause of death. . . .

three objections. First, the court rejected plaintiff's instruction 3, based on IPI 100.01,[7] because not all of the defendants are common carriers, and the passengerhood of Joseph is in dispute. Second, the court gave the jury, over the plaintiff's objection, the "passenger" definition of IPI 100.09,[8] which plaintiff alleges is not accurate in light of Illinois case law. Third, the court refused to give an instruction based on IPI 100.15,[9] which specifically states that a common carrier must exercise the highest degree of care in "selecting a place for [passengers] to board . . . its vehicles." We will consider each of these alleged errors in turn.

First, we agree with the trial court that giving IPI 100.01 unmodified might have misstated the law and confused the jury. As the trial court noted, only one of the defendants here is a common carrier, and IPI 100.01 presumes that the plaintiff is a passenger. Thus, it was appropriate to modify the instruction. The trial court gave a version

---

[7] Plaintiff's instruction 3: At the time of the occurrence in question, the defendant, Amtrak, was a common carrier. A common carrier is not a guarantor of its passengers' safety, but it has a duty to its passengers to use the highest degree of care consistent with the mode of conveyance used and the practical operation of its business as a common carrier by rail. Its failure to fulfill this duty is negligence.

[8] Court's instruction 2: When I use the word passenger, I mean a person who with the actual or implied consent of the carrier is in the act of boarding the conveyance of a common carrier.

[9] Plaintiff's instruction 5: In selecting a place for Joseph Aliotta to board its vehicles, it was the duty of the defendant, Amtrak, as a common carrier, to exercise the highest degree of care consistent with the mode of conveyance used and the practical operation of its business as a common carrier by rail. The failure of the defendant to fulfill this duty is negligence.

of the instruction modified in three ways.[10] First, the court informed the jury of the degree of care owed by Amtrak in the alternative that they do not find Joseph Aliotta to have been a passenger. Second, it distinguished Amtrak from the other defendants, which are not common carriers. These two modifications, while somewhat verbose, we believe to be accurate and adequately clear statements of the law. Third, the trial court limited the common carrier's presumably elevated duty to a duty "with regard to the operation of the train." This modification is closely tied to the other jury instructions issues, and we discuss it below.

The remaining jury instruction issues, which define the circumstances under which common carriers owe an elevated duty of care, are somewhat intertwined. The premier Illinois case dealing with the definition of "passenger," or otherwise stated, the class of person to whom common carriers owe the highest degree of care, is *Katamay v. Chicago Transit Authority*, 289 N.E.2d 623 (Ill. 1972). Eleanora Katamay, who was trying to board a Chicago Transit Authority (CTA) train that was in the station (at what is now the Western stop on the Blue Line), caught her heel between the planks of the platform, causing her

---

[10] Defendants' instruction 3: At the time of the occurrence in question, the defendant, Amtrak, was a common carrier. A common carrier is not a guarantor of its passengers' safety, but with regard to the operation of the train, it has a duty to its passengers to use the highest degree of care consistent with the mode of conveyance used and the practical operation of its business as a common carrier by rail. Its failure to fulfill this duty is negligence. In all other respects (including the operation of the train if you find that Mr. Aliotta was not a passenger), it was the duty of the defendants Amtrak and Mr. Gilmer, before and at the time of the occurrence, to use ordinary care for the safety of the plaintiff. That means it was the duty of the defendants to be free from negligence.

to fall. It was disputed whether Katamay was even in contact with the train after she fell. She testified at trial that her head was in the doorway, but others, including her own witness, testified that her head was a couple of feet from the train. *Katamay v. Chi. Transit Auth.*, 273 N.E.2d 510, 512 (Ill. App. 1971). After a jury ruled for Katamay, an Illinois appellate court held that she was not a passenger as a matter of law.[11] The Supreme Court of Illinois, after a lengthy analysis, overturned the appellate court and held that there was sufficient evidence for the jury to conclude that she was a passenger, under the IPI 100.09 definition, even if she was not in contact with the train. Despite the fact that she was only potentially in contact with the train, and her injury was not caused by the train or its motion, Katamay was owed the highest degree of care because she was "in the act of boarding."

The plaintiff's suggested jury instruction modified IPI 100.09 to include as passengers not only those who are "in

---

[11] In Illinois, whether an individual is a passenger of a carrier is, given uncontroverted facts, a question of law. *Skelton v. Chi. Transit Auth.*, 573 N.E.2d 1315, 1328 (Ill. App. 1991). While the allocation of issues between court and jury is a matter of forum law, *cf. Byrd v. Blue Ridge Rural Elec. Coop., Inc.*, 356 U.S. 525 (1958) (holding that, in diversity suits, state law should rarely intervene in the federal procedural question of allocation of issues between judge and jury), *overruled on other grounds*, *Hanna v. Plumer*, 380 U.S. 460 (1965); *Mayer v. Gary Partners & Co.*, 29 F.3d 330, 333 (7th Cir. 1994) (holding that "who decides an issue is a procedural question" governed by forum law), we are not certain that we understand the basis of the trial judge's conclusion that there was a question of fact here which made the determination of Joseph's "passenger" status a jury question. Our conclusion is that there is an open factual question as to whether Joseph was acting with the "actual or implied consent" of Amtrak, making a jury determination appropriate. Neither party appeals the allocation of this question to the jury.

the act of boarding" but all persons "standing on the platform . . . with intent to board," and the plaintiff asks us to find that IPI 100.09, unmodified, was an inadequate statement of the law. As *Katamay* itself implements IPI 100.09 and the comments to IPI 100.09 in *Illinois Pattern Jury Instructions, Civil*, cite *Katamay*, the plaintiff has a rather heavy burden in attempting to demonstrate that *Katamay* suggests that IPI 100.09 should not have been used in this case. Nevertheless, we believe that the jury was misled without the gloss of *Katamay* and other cases on the IPI. That is, while the IPI may suffice in most cases to distinguish between passengers and non-passengers (as defined by case law), *Katamay* substantially broadened the class of persons entitled to a high degree of care in a way that the IPI does not and the district court instruction did not capture.

Rather than granting undue deference to the wording of the IPI, we believe that a clearer understanding of Illinois law can be gathered from reading *Katamay* carefully. The authorities cited by the Illinois Supreme Court in reaching its holding in *Katamay* strongly suggest that someone in Joseph Aliotta's position (standing on the platform with intent to board) would be considered a passenger according to Illinois law. "[T]he rationale for the imposition of the duty upon a carrier to exercise the highest degree of care . . . while [a person] is a passenger as distinguished from the lesser duty owed at all other times is that the degree of care should be commensurate with the danger to which the passenger is subjected." *Katamay*, 289 N.E.2d at 625, citing *Sims v. Chi. Transit Auth.*, 122 N.E.2d 221 (Ill. 1954). The *Katamay* court cites with approval *Lake Street Elevated Railroad Co. v. Burgess*, 66 N.E. 215 (Ill. 1903), where a passenger fell from a platform onto the track below due to the absence of a protective gate. *Lake Street* in turn, the *Katamay* court noted, relied on a passage from *Chicago & Eastern Illinois Railroad Co. v.*

*Jennings*, 60 N.E. 818, 820-21 (Ill. 1901), a case which held that a man on his way to the station is not a passenger:

> "It is not necessary, to create the relation, that the passenger should have entered a train, but if he is at the place provided for passengers, such as the waiting room or platform at the station, with the intention of taking passage and has a ticket, he is entitled to all the rights and privileges of a passenger. . . . Whenever a person goes into such a place with the intention of taking passage, he may fairly expect that the company will understand that he is a passenger and protect him."[12]

Also according to *Katamay*, the duty owed to passengers extends beyond the time the passenger is on the vehicle. "'The relation of carrier and passenger does not terminate until the passenger has alighted from the train and left the place where passengers are discharged.'" *Katamay*, 289 N.E.2d at 625 (quoting *Chi. Terminal Transfer R.R. Co. v. Schmelling*, 64 N.E. 714 (Ill. 1902)). "'[T]he [railroad] is . . . bound to furnish [the passenger] an opportunity safely to alight from the train. . . . In the case at bar, when the [passenger] was injured, he was still upon and within the narrow space between the railroad tracks, which was the only place which the [railroad] had provided for him to stand upon when he alighted from the train.'" *Katamay*, 289 N.E.2d at 625 (quoting *Pa. Co. v. McCaffrey*, 50 N.E. 713, 714 (Ill. 1898)). If the elevated duty extends to the space the carrier provides for the passenger to alight, logic dictates that the duty also exist for the space where a passenger must stand in preparation for boarding.

---

[12] The reach of *Jennings* may have been somewhat limited by *Davis v. South Side Elevated Railroad Co.*, 127 N.E. 66 (Ill. 1920), though the *Katamay* court makes no mention of it.

The principal case limiting the duty of care owed by railroads is *Davis v. South Side Elevated Railroad Co.*, 127 N.E. 66 (Ill. 1920), where Louise Davis (at what must now be the 35th St.-Bronzeville-IIT stop on the Green Line) slipped on a banana peel and fell down a set of stairs. A close reading of *Davis*, however, also supports the plaintiff's and not the defendants' position.

> "'There is really no valid reason why a railroad company should be held to a higher degree of care in maintaining its station buildings . . . .' 'A railroad company is held to the highest degree of care in respect to the condition and management of its engines and cars, because negligence in that respect involves extreme peril to passengers, against which they cannot protect themselves.'"

*Davis*, 127 N.E. at 67 (quoting 4 Elliott on Railroads, 2nd ed., § 1590 and *Moreland v. Boston & Providence R.R. Corp.*, 6 N.E. 225, 227 (Mass. 1886)).

> "[I]n all [the cases enforcing the highest degree of care,] it is clear that the accidents happened in boarding or alighting from trains *or in the course of their moving*, and the reason for the highest degree of care in those cases was fully as great as if the passenger were on the moving train . . . . [T]he same degree of care is not required as to the stations and approaches to and from them, because the danger incurred in such surroundings is not the same as it is on moving trains."

*Davis*, 127 N.E. at 68 (emphasis added). At least when they are victims of accidents which involve the trains themselves, persons who are on the platform with intent to board a train are passengers, according to the above pronouncements of Illinois law.

What distinguishes Joseph Aliotta's case from the many cases cited in *Katamay* is that most of those involved passengers getting off trains or about to board trains that

had already pulled into the station and stopped. The problem here, of course, was precisely that the train did not stop. There is at least one Illinois case in which a train failed to stop, *Skelton v. Chicago Transit Authority*, 573 N.E.2d 1315 (Ill. App. 1991). Joseph Skelton was waiting for a CTA train at a station (what is now the Oak Park stop on the Blue Line) late at night, when a train passed without stopping. Frustrated, he attempted to flag down the next train, which was not slowing down to stop, and fell onto the tracks. The accident resulted in the amputation of his arm. The facts in that case are similar to those in the present one not only because both Josephs were unable to buy a ticket beforehand (the CTA station was unstaffed and a sign instructed riders to buy their ticket on board, just as we are led to believe the Amtrak station was unstaffed), but also because neither Joseph had a meaningful opportunity to try to board his respective train. The Illinois Appellate Court noted in *Skelton* that "Illinois courts have long held that a contractual relationship between passenger and carrier begins when the passenger has presented himself at the proper place to be transported with the intention of becoming a passenger and is then either expressly or impliedly accepted by the carrier for transportation." *Id.* at 1328. The fact that the train would not and did not stop, and therefore, that the act of becoming a passenger—if that is what it was— could not be "completed" does not seem determinative of anything. "Passengers" waiting on platforms for one train are frequently passed by other trains traveling at high speeds (which they obviously cannot board). There is no good reason why this change in the identity of the danger-laden vehicle should alter their status.

Further, we do not believe that the fact that Joseph Aliotta was at the station at a time when no train was scheduled to stop is dispositive here, since the appropriateness of Joseph's expectations can be determined by

the jury when it decides whether there was "actual or implied consent of the carrier" (a requirement common to IPI 100.09, the plaintiff's modified instruction and the holding in *Skelton*) to stand on the platform in preparation for boarding a train. Here the station was likely unstaffed and there was no schedule posted. Joseph had called the night before for the schedule, which information he interpreted in light of his many years of familiarity with the local train service. At, say, an abandoned station with no service at all, Amtrak perhaps should not be expected to account for the safety of those individuals who have no reason to expect a train to come and stop for them. Given the facts at hand, however, we believe that there is an open factual question as to the "actual or implied consent" of the railroad. In all other respects, we believe that Joseph met the Illinois legal definition of "passenger." The jury instruction submitted by the plaintiff was an appropriate one under these particular circumstances, and IPI 100.09 was an inadequate statement of the law.

The court also refused to give IPI 100.15, regarding the duty of common carriers to select safe boarding places, based on the defendants' argument that IPI 100.15 does not apply to trains, whose stations are in fixed places, but rather applies only to conveyances, such as taxis or streetcars, on which the operator has discretion where to discharge or pick up a passenger. The defendants cite *Davis*, which states that a railroad does not have an elevated duty of care with regard to maintenance of its stations. However, as we noted above, *Davis* does not govern accidents which involve the motion of the train, but speaks more to those possible conditions of a station facility that are no different and no more dangerous than similar conditions in any other public space (e.g., a banana peel on a staircase). The defendants also note, accurately, that all of the cases cited under IPI 100.15

deal with buses or taxis, and not trains. *See* IPI 100.15 cmt. The defendants fail, however, to cite any cases holding that the IPI does *not* apply to trains. On the contrary, we have found substantial case law indicating that IPI 100.15 would have been appropriate here. For one, it appears that IPI 100.15 was given in *Katamay*. "Over objection of the defendant the trial court instructed the jury that the defendant was a common carrier and that, in selecting a place for the plaintiff to board its train, defendant was to exercise the highest degree of care as to plaintiff's safety." *Katamay*, 273 N.E.2d at 512. The appellate court, although ruling that the trial court should have entered a judgment notwithstanding the verdict on the ground that Katamay was not a passenger as a matter of law, made no ruling finding error in the giving of this jury instruction. Also, Illinois cases agree that trains must provide passengers a safe place to disembark. "'It was the duty of [the railroad] to provide a safe means of access to and from the station . . . and the [passenger] had a right to assume that the place adopted for discharging its passengers . . . was safe.'" *Davis*, 127 N.E. at 68 (quoting *Chi. Terminal Transfer R.R. Co.*, 64 N.E. at 717 (holding that the railroad betrayed its duty of care by providing no platform, but only a patch of "stone and sand, not wider than four, five or six feet, located between the tracks of two railroad companies," at a regular stopping place and approving a "safe place to board and alight" jury instruction)). *See also Chi. & Alton R.R. Co. v. Wilson*, 63 Ill. 167, 171 (1872) (calling the railroad company "guilty of reckless and wanton carelessness" for constructing a narrow island platform similar to the one in Gilman and describing it as almost "a first-class man trap"). As to the design elements of stations or platforms that make passengers vulnerable to accidents involving the operation or movement of the trains, common carriers by rail owe passengers the highest degree of care. We believe that IPI 100.15 would have been ap-

propriate here, and that it was error for the trial judge not to give it.

Going back to the first jury instruction regarding Amtrak's duty of care discussed above, in light of the applicability of IPI 100.15, we also believe that IPI 100.01 was modified too restrictively in stating that Amtrak owes a highest degree of care to passengers only "with regard to the operation of the train."

The jury instructions here, in light of Illinois law, were inaccurate and misleading. Additionally, we must determine whether the faulty instructions confused or misled the jury. The central issue debated here is what degree of care Amtrak owed to Joseph Aliotta. Under the instructions given by the court, the jury had little recourse other than to find that Joseph was not a passenger, since he was not, under most reasonable interpretations, "in the act of boarding." According to our reading of Illinois law, the class of individuals to whom common carriers by rail owe the highest degree of care is more expansive, and includes those individuals who, with the actual or implied consent of the carrier, are standing on a platform in preparation for boarding a train. Because it is possible, even probable, that the jury would have considered Joseph to be within this greater class of individuals, requiring them to assess negligence under a more stringent standard, we believe that the jury was confused and misled. Taking into account an elevated duty of care, the jury quite possibly might have come out the other way. As they touched upon such core issues in the trial, the jury instructions caused unfair prejudice to the plaintiff, thereby justifying the granting of plaintiff's Motion for a New Trial.

### III.

For the reasons given above, the judgment of the district court is REVERSED and the case is REMANDED for further proceedings not inconsistent with this opinion.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*

USCA-02-C-0072—1-3-03