In the

# United States Court of Appeals
## For the Seventh Circuit
―――――――――

Nos. 06-1909, 06-1910

THOMAS E. MILLER and LYNN MILLER,

*Plaintiffs-Appellants,*

*v.*

ILLINOIS CENTRAL RAILROAD COMPANY, *et al.,*

*Defendants-Appellees.*

―――――――――

Appeals from the United States District Court
for the Southern District of Illinois.
No. 03-657-GPM—**G. Patrick Murphy**, *Chief Judge.*

―――――――――

ARGUED DECEMBER 6, 2006—DECIDED JANUARY 25, 2007

―――――――――

Before POSNER, RIPPLE, and WOOD, *Circuit Judges.*

POSNER, *Circuit Judge.* The Millers brought suit in an Illinois state court against a variety of companies, seeking damages for serious injuries sustained by Mr. Miller when the truck he was driving was struck by an Amtrak train at a crossing. Amtrak was one of the defendants and exercised its right to remove the case to federal district court, *Aliotta v. National R.R. Passenger Corp.,* 315 F.3d 756, 758 n. 1 (7th Cir. 2003), but the parties have assumed that Illinois law remains applicable to the plaintiffs' claim against Amtrak (as well as, of course, the other defen-

dants), and we think the assumption is correct. *Id*. at 759; *Hollus v. Amtrak Northeast Corridor*, 937 F. Supp. 1110, 1114 (D.N.J. 1996). Although Amtrak's right to remove is based on its being deemed an instrument of the federal government because more than 50 percent of its stock is owned by the United States, see 28 U.S.C. § 1349; cf. *Empire Healthchoice Assurance, Inc. v. McVeigh*, 126 S. Ct. 2121, 2131-32 and n. 3 (2006), nowhere is there any indication that Congress wanted victims of Amtrak accidents to have any rights other than those conferred on victims of railroad accidents by state law. Cf. 49 U.S.C. § 28103(a)(1) (restricting the award of punitive damages in suits against Amtrak); *id*., §§ 24301(g), 28103(c); compare *A.I. Trade Finance, Inc. v. Petra International Banking Corp.*, 62 F.3d 1454, 1463-64 (D.C. Cir. 1995). And if the source of a plaintiff's claim is state law, then state law should determine the merits of the claim, whatever the source of federal jurisdiction. Henry J. Friendly, "In Praise of *Erie*—And of the New Federal Common Law," 39 *N.Y.U. L. Rev.* 383, 408-09 n. 122 (1964).

Even if, contrary to what we've just said, the question of Amtrak's liability for railroad accidents should be thought one "involving the rights of the United States arising under nationwide federal programs" and governed therefore by federal common law, *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726 (1979), the sensible federal rule as in *Kimbell* would be to make state law the rule of decision. Otherwise the federal courts would have to make up a common law of railroad accidents, a laborious chore that would create arbitrary differences between the liabilities of Amtrak and those of other railroads with which it shares tracks. This concern is underscored by the fact that Amtrak is merely one of several defendants in this

case and that the others are in federal court only (so far as appears) by virtue of the federal district court's supplemental jurisdiction. See 28 U.S.C. § 1367(a). There is nothing to distinguish Amtrak from the other defendants—especially the other railroad defendant—except its majority ownership by the federal government.

The district court granted summary judgment for the defendants on the ground that Miller's conduct had been the "sole proximate cause" of the accident. Because of the procedural posture, we construe the facts as favorably to the plaintiffs as the record permits.

The Illinois Central Railroad had hired defendant S.T.S. Acquisitions (STS) to build and repair some fuel-related facilities at the railroad's railyard in Centralia, a town in southern Illinois. STS in turn hired another defendant, Central States Environmental Services (CSES), to be the general contractor for most of the construction work. CSES in turn hired S&M Basements to be a subcontractor to do the concrete work required for the project. Miller was a partner in S&M.

The most convenient way for Miller and the other workers on the railyard project to reach the construction site was by driving across three parallel railroad tracks at a private grade crossing, that is, a crossing not intended for the use of the general public. There were no gates or signals at the crossing and no flagman posted there.

The tracks ran north and south and the construction site was to the west of them. When a worker on his way home from work drove from the site and entered the crossing, the first track he encountered was a "rip track," which is a spur or siding in which railroad cars are re-

paired in place. The next (middle) track was used by a switch engine for switching. The third and easternmost track was a main line. An Amtrak train ran on the main line past the crossing every day at about 5 p.m. at a fast clip.

It was around that time on a clear day in August that Thomas Miller drove his truck onto the crossing; and since it was late afternoon and he was driving east, the sun was behind him. A line of boxcars on the siding blocked his view to the right (south). He either stopped or slowed after he crossed the siding, and then continued eastward, crossing the middle track safely. But as he crossed the main line, a northbound Amtrak train traveling at 78 miles per hour (one mile per hour below the speed limit) struck the rear of his truck. Miller has no recollection of the accident, a common result of a serious accident. Although one witness testified that she did not hear the train sound its whistle (and that she would have heard if it had), as it was required to do when approaching a crossing, several others were positive they heard it and the train's engineer testified that in addition to blowing the standard whistle pattern he began blowing frantically when he saw that the truck was on a collision course with the train. The "ditch light" on the locomotive was on when the train reached the crossing. It is connected to the whistle; and the connection had been working that morning. It could have broken down before the Amtrak train arrived at the crossing, but of that there is no evidence. An independent expert's report states without contradiction that an examination of the locomotive's "black box" after the accident revealed that the whistle had indeed been blown in the irregular warning pattern to which the locomotive engineer testified:

"as the locomotive got closer to the crossing the event recorder data show that the engineer altered his horn pattern, consistent with his testimony and the testimony of those who heard the train horn."

The witness who said the whistle hadn't been blown was testifying almost four years after the accident, and in the face of all the other evidence we do not think a reasonable jury could conclude that the whistle had not been blown, merely because one witness did not recall hearing the whistle years after a very dramatic event—she was in her kitchen and testified that she heard the collision, ran outside, heard Miller screaming for help, and watched her neighbors "messing with—taking care of" Miller. It would be easy for her to forget the one routine feature of the episode—a train's whistle blowing, albeit irregularly. We conclude that summary judgment was rightly granted in favor of Amtrak.

But the reasoning that led the district judge to grant summary judgment for the other defendants is unsatisfactory. He began by noting that an Illinois statute provides that "a railroad track across a highway is a warning of danger," and therefore a driver approaching such a crossing "shall not proceed until he or she checks that the tracks are clear of an approaching train." 625 ILCS 5/11-1201(a-5). The judge thought that since the engineer saw Miller, Miller must have seen the train, and therefore he violated the statute and was negligent as a matter of law. This conclusion would follow, if the premise were correct, without need for statutory codification of so elementary a precept of prudence. But the premise is incorrect. The engineer could not have seen Miller, though he saw Miller's truck. Miller was in the driver's seat of the truck, and therefore on the left-hand side of the truck's cab. Since

he was driving east and the train was traveling north, the engineer, whose perch in his locomotive was higher than the cab of the truck, could have seen only the passenger's seat. More to the point, since Miller was sitting in the seat farther from the train, he may not have seen the train until too late. A train's whistle is deafening, so even though his windows were closed and his truck was noisy, it is likely that he heard it. But he may have heard it too late to be able to stop—indeed, considering that the train struck the rear of his truck, he may have sped up to try to avoid the collision.

What is critical, as far as the issue of Miller's negligence is concerned, is the distance that he had to traverse between the line of boxcars that blocked his view to the south and the easternmost end of the crossing, where he would clear the main line and be safe. The lawyers' imprecision on this score is exasperating, as nothing could be simpler than measuring the length of the crossing, including the part of the crossing to the east of the siding. All we have is testimony that the distance between the tracks was about ten feet. The standard U.S. railroad gauge is 4 feet 8.5 inches, and if "about ten feet" refers to the distance between the east rail of one track and the west rail of another, the total distance from the west rail of the siding (the first track) to the east rail of the main line (the third track) was almost 35 feet. In addition, the crossing would have to continue for several feet beyond the east rail of the main track, because the railroad cars overhang the rails on each side; and since the chassis of the truck extended several feet in front of the truck's cab, to have a clear view of the tracks he would have to stop and look before the truck reached the first track. *Pokora v. Wabash Ry.*, 292 U.S. 98, 100 (1934) (Cardozo, J.).

Thus, as Miller crept from behind the line of boxcars toward the switching and main lines, he had a tricky calculation to make: if he tried to cross both lines in one movement, he risked being struck while he was still on the main line, but if, therefore, he stopped before crossing the main line, most of his truck would be sitting motionless on the switching line. (Miller was driving a one-ton utility bed Ford pickup truck, the smallest exterior length of which is approximately 16 feet, and there were only 10 feet between tracks.) The middle track was "live" too. It is used only occasionally and by a switching engine that moves slowly; still, no one wants to be stopped on a railroad track that is in use, even occasional use, since if one stalled one could be in serious trouble. "Stop, look, and listen" is not a reliable formula for crossing a series of live railroad lines. See *id*. at 104. The average person who crosses a series of parallel tracks looks up and down before entering the crossing; he does not stop at each track; and probably he is prudent not to.

All this said, it is highly probable that Miller was negligent in failing to see or hear the train before he reached the main line. As he proceeded across the siding, he should have looked up and down the two tracks in front of him and had he done so he would have seen the train—the tracks were straight and, except for the siding, the view along them was unobstructed, the day clear, the sun behind him. In all likelihood he was going too fast when he crossed the siding to be able to stop before he reached the main line, which may have been as near as 25 feet. He had been working on the site for seven or eight days and probably knew (because his coworkers testified that *they* knew) that a train usually came along the main line between about 5 and 5:30 p.m., so he should

have been particularly alert when he entered the crossing at that time.

Even if this is what happened, and so even if Miller was indeed negligent, it would not follow that he was the "sole proximate cause" of the accident, whatever exactly that means. The judge thought Miller must have been the "sole proximate cause" because the defendants had no "duty" of care toward him since it was not "foreseeable" that someone would cross at too high a speed to avoid being hit by the train. Duty, proximate cause, and foreseeability are of course common terms in the vocabulary of tort lawyers, but like much legal jargon they can obscure rather than illuminate a particular case. Sometimes it is sensible in a tort case to ask simply whether a reasonable jury could have found that the defendants or any of them behaved carelessly, and, if so, whether the plaintiff's conduct provides a complete defense. That is the approach we'll take here.

We do not think a reasonable jury could find that either STS or CSES was careless, because they did not control the crossing or its use. The crossing was one way of getting to the construction site, which was about 100 feet west of the tracks, but there was at least one other way, though the railroad crossing was more convenient. If you have a highway accident while driving to a grocery store, the store is not liable. It is not that it has no duty of care to its customers; a customer who slipped and fell in the store because of the negligence of an employee would have a claim against the store. But the store would not be responsible for accidents to customers that occurred elsewhere, because those accidents would not be caused by negligence by the store.

We would have a different case if CSES or STS had controlled the crossing, *Kotecki v. Walsh Construction Co.*, 776 N.E.2d 774, 777 (Ill. App. 2002), but there is no evidence of that unless it is Miller's statement in his deposition that the crossing "was where you entered" and left the construction site, and that is far short of signifying control. Nor is it even remotely likely that the Illinois Central would have ceded control of a crossing to a company that was not in the railroad industry—that would be a dangerous thing to do.

We would also have a different case had CSES or STS directed S&M Basements to use the crossing to get to the work site. "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." *Restatement (Second) of Torts* § 414 (1965). (The Illinois courts treat this provision of the *Restatement* as a correct statement of Illinois common law. *Kotecki v. Walsh Construction Co.*, *supra*, 776 N.E. 2d at 777; *Bokodi v. Foster Wheeler Robbins, Inc.*, 728 N.E.2d 726, 731-32 (Ill App. 2000); *McConnell v. Freeman United Coal Co.*, 555 N.E.2d 993, 995 (Ill. App. 1990).) But there is no evidence that either company had retained such a "right of supervision that the contractor [S&M] [was] not entirely free to do the work in his own way." *Restatement (Second) of Torts*, *supra*, § 414, comment c; see *Bokodi v. Foster Wheeler Robbins Inc.*, *supra*, 728 N.E.2d at 732-33. CSES could assume that S&M would exercise due care in transporting S&M's workers to and from the work site.

A reasonable jury could, however, find that the Illinois Central was negligent. Although Miller was injured at a "private" crossing, the workers who were working on the

fuel oil system for the railroad on the railroad's property were using the crossing at the railroad's invitation, as it was the most convenient way of getting to the site. *LaFever v. Kemlite Co.*, 706 N.E.2d 441, 448 (Ill. 1998); *Restatement (Second) of Torts* § 332, comment e. Knowing that the crossing was being used by a number of persons who were not railroad workers alert to the dangers of a rail-yard, the railroad welcomed their use of it. The crossing road crossed several tracks—one a main line on which trains ran at high speed—and yet lacked any safety precautions. The two parallel live tracks made a safe passage tricky as we explained, and by parking a line of boxcars next to the westernmost crossing the railroad had made it even trickier. So it was a dangerous crossing—or so a jury could reasonably find—and a jury might also find that the railroad could at a cost lower than the expected accident cost have stationed a flagman at the crossing when a passenger train was expected (for the engineer was required to call a few minutes ahead to notify the railyard that he was coming through), for that was only once or twice a day. True, Amtrak trains are often delayed, so the flagman might have had to wait around much of the day waiting for the call, though a delay in the afternoon train would be no problem if it lasted beyond the time when all the workers would have gone home. It is also true that there were freight trains running on the main line throughout the day, but freight trains are less dangerous because they're slower. Anyway, these are matters to be sorted out at a trial, along with consideration of alternatives—maybe the railroad could at modest cost have moved the boxcars to some other point on the siding, unblocking the view to someone crossing from the westernmost track.

If the cost to the railroad of a precaution that would have averted the accident would have been less than the cost of an accident if it occurred discounted (multiplied) by the probability (enhanced by the number of workers using the crossing) that it would occur, the railroad was negligent. See *Brotherhood Shipping Co. v. St. Paul Fire & Marine Ins. Co.*, 985 F.2d 323, 327 (7th Cir. 1993); *Davis v. Consolidated Rail Corp.*, 788 F.2d 1260, 1263-64 (7th Cir. 1986) (Illinois law); *Ward v. K Mart Corp.*, 554 N.E.2d 223, 226-27 (Ill. 1990); *Pageloff v. Gaumer*, 849 N.E.2d 1086, 1088-89 (Ill. App. 2006). That is for a jury to determine. Mention of juries prompts us to interrupt our discussion to note that because Amtrak is being dismissed from the case, the question whether there is a right to a jury trial in a damages suit against Amtrak is academic. That there is such a right has been assumed, see, e.g., *Aliotta v. National R.R. Passenger Corp., supra*; *National R.R. Passenger Corp. v. Rountree Transport & Rigging, Inc.*, 422 F.3d 1275 (11th Cir. 2005); *National Passenger R.R. Corp. v. Maylie*, 910 F.2d 1181 (3d Cir. 1990), but we cannot find a case on point. The Supreme Court held in *Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374 (1995), that Amtrak is to be deemed a part of the U.S. government for purposes of the First Amendment. But the Court added that the fact that Amtrak's organic statute says that Amtrak "is not a department, agency, or instrumentality of the United States Government," 49 U.S.C. § 24301(a)(3), is a disclaimer of sovereign immunity, *Lebron v. National R.R. Passenger Corp., supra*, 513 U.S. at 392, and such a disclaimer might seem to expose Amtrak to all the normal hazards of litigation. Cf. *Marcella v. Brandywine Hospital*, 47 F.3d 618, 619-24 (3d Cir. 1995). But this we needn't decide in the present case.

A jury that found that the Illinois Central was negligent would doubtless find that Miller was negligent too. But a victim's negligence is no longer a complete defense to a negligence suit, provided that the victim is not more careless than the injurer. 735 ILCS 5/2-1116(c); *Mrowca v. Chicago Transit Authority*, 740 N.E.2d 372, 374 (Ill. App. 2000). If Miller was suicidal or thought he was playing chicken with the train's engineer, he assumed the risk of what happened and would be barred from all relief. *Bonavia v. Rockford Flotilla 6-1, Inc.,* 808 N.E.2d 1131, 1137-38 (Ill. App. 2004). But neither possibility is suggested.

We conclude that the district judge was right to grant summary judgment for all the defendants except the Illinois Central. The judgment is therefore affirmed in part and reversed in part, and the case remanded for further proceedings consistent with this opinion.

AFFIRMED IN PART,
REVERSED IN PART, AND REMANDED.

RIPPLE, *Circuit Judge*, dissenting.   I would affirm the judgment of the district court in all respects for the reasons given by the district court.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*